**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Savare DeFELICE, Defendant-Appellant.**

No. 80–3397
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.
Unit A

April 9, 1981.

Vance E. Ellefson, New Orleans, La., for defendant-appellant.

Hattie M. Broussard, Asst. U. S. Atty., Stanley Millan, U. S. Army Corps of Engineers, New Orleans, La., James W. Moorman, Dirk D. Snel, A. Donald Mileur, U. S. Dept. of Justice, Land & Natural Resources Division, Main Justice, Appellate Section, Washington, D. C., for plaintiff-appellee.

Before BROWN, POLITZ and TATE, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

On February 28, 1980, the District Court entered an injunction ordering Appellant/DeFelice to remove the sand and other fill materials which he had placed in the Cheniere Traverse Canal. His actions constituted an attempt to restore access to his property. The Court found DeFelice's actions violated provisions of the 1899 Rivers and Harbors Act (RHA) and Federal Water Pollution Control Act (FWPCA) which require the authorization of the United States Corps of Engineers (Corps) prior to any construction or polluting in any of the "navigable waters of the United States." Our review of the facts, applicable statutes and code regulations, require us to affirm the District Court's actions.

## I. Up The Proverbial Creek Without A Permit

The present controversy arises out of a purchase of property by the DeFelice family in Plaquemines Parish, Louisiana in 1944. Because the land was accessible only through the property owned by Citrus Lands of Louisiana, the purchase agreement included a right of access through Citrus Lands' property to a shell-surfaced roadway atop a dam which crossed a man-made drainage canal—commonly known as the Cheniere Traverse Canal (West Canal).[1] Eventually, the right of access lands were sold to a private individual in 1959 by Citrus Lands Inc. When the DeFelices refused to sell their property to this same individual, a gate was placed across the right-of-way which left the property inaccessible except by water. At about this same time, unknown persons started cutting away at the dam across the canal until it was completely destroyed by late 1965 or early 1966.

DeFelice's attempts at negotiations with the adjacent landowners to remove the gate proved fruitless. Suit was filed in 1974 which resulted in the decision of *DeFelice*

---

1. Maps dated as far back as 1903 and aerial photos taken by the Corps as early as 1958, show the presence of the dam across the canal.

*Land Corp. v. Citrus Land of La.*, 330 So.2d 631 (La.App. 4th Cir. 1976), granting the DeFelice family right of access to and egress from the property at the point it had previously exercised under the original agreement. Pursuant to this judgment, an order was entered by the District Court for a survey to establish the metes and bounds of the original right-of-way. In July 1977, in recognition of this legally established right of passage, DeFelice began to reconstruct the dam by placing sand and other fill materials in the canal.[2] On July 17, 1977, an investigator of the Corps appeared at the proposed dam site and ordered the work stopped.[3] After several unsuccessful attempts to serve a cease and desist order, one was sent by certified mail to DeFelice alleging that he was in violation of §§ 9, 10 of the 1899 (RHA), 33 U.S.C.A. §§ 401, 403,[4] and §§ 301(a), 404(a) of the (FWPCA), 33 U.S.C.A. §§ 1311(a), 1344(a)[5], for failing to obtain respectively dam construction and pollutant discharge permits.[6]

The Corps subsequently initiated litigation against DeFelice seeking an injunction and order to remove the material which he

---

**2.** The record fixes the actual construction site at Woodpark Campsite approximately 1.2 miles southeasterly from Myrtle Creek, Louisiana and immediately southwesterly from Louisiana Highway 23 in Plaquemines Parish, Louisiana.

**3.** The record reflects that by July 19, 1977, the canal which is approximately 40 feet in width at this point, had already been completely filled up to ground level on each bank and was completely blocking the waterway.

**4.** Section 9 of the 1899 RHA, 33 U.S.C.A. § 401 provides:

It shall not be lawful to construct or Commence the construction of any bridge, dam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of the Army: Provided, That such structures may be built under authority of the legislature of a State across rivers and other waterways the navigable portions of which lie wholly within the limits of a single State, provided the location and plans thereof are submitted to and approved by the Chief of Engineers and by the Secretary of the Army before construction is commenced: And provided further, That when plans for any bridge or other structure have been approved by the Chief of Engineers and by the Secretary of the Army, it shall not be lawful to deviate from such plans either before or after completion of the structure unless the modification of said plans has previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of the Army. Section 10 of the 1899 RHA, 33 U.S.C.A. § 403 provides:

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; . . . and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor or refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Secretary of the Army prior to beginning the same.

**5.** Section 301(a) of the FWPCA, *86 Stat. 844*, 33 U.S.C.A. § 1311(a) provides:

Except as in compliance with this section and sections 302, 306, 307, 318, 402, and 404 of this Act, the discharge of any pollutant by any person shall be unlawful.

33 U.S.C.A. § 1362(6) provides:

The term "pollutant" means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water.

Section 309(d) of the FWPCA, *86 Stat. 860*, 33 U.S.C.A. § 1319(d), provides:

Any person who violates section 301, 302, 306, 307, or 308 of this Act, or any permit condition or limitation implementing any of such sections in a permit issued under section 402 of this Act by the Administrator, or by a State, and any person who violates any order issued by the Administrator under subsection (a) of this section, shall be subject to a civil penalty not to exceed $10,000 per day of such violation.

Section 404(a) of the FWPCA, *86 Stat. 884*, 33 U.S.C.A. § 1344(a), provides:

The Secretary of the Army, acting through the Chief of Engineers, may issue permits, after notice and opportunity of public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites.

**6.** *See* Appendix I.

had placed in the canal. DeFelice counter-claimed for the value of the property taken from him by the Corps' actions.[7] Testimony from surrounding residents whose access to other canals leading to the Gulf of Mexico had been blocked by the DeFelice's dam, led the District Court to find that the materials placed in the canal had reduced the depth of the water and impaired navigation. The Court entered an injunction on February 28, 1980, and ordered DeFelice to remove this material in an amount sufficient to restore the depth of the water and the contour of the canal adjacent to the dam site to its pre-1977 condition.[8]

DeFelice seeks a review of this judgment alleging that the District Court erred (i) in finding that the Corps had jurisdiction over the replacement of the dam in a private canal based upon the alleged "navigability" of the canal, and (ii) in accepting the Corps' interpretation of the phrase "currently serviceable" as used in the regulations.

### The Ebb And Flow Of "Navigability"— Corps' Jurisdiction?

■ The principal question on appeal is whether the District Court correctly found that the Corps had jurisdiction by operation of law from the time the canal became capable of navigation under § 10 of the (RHA), 33 U.S.C.A. § 403. (*See* n.4, *supra*)[9]. The focal point then becomes the correct standard for determining `"navigability" and ultimately Corps' jurisdiction. The Court below held that the mere capability of navigability in commercial use and/or

the fact that the canal was subject to the ebb and flow of the tide was sufficient to establish Corps' jurisdiction even over a private and artificial canal. That finding was not clearly erroneous.

The Corps has adopted the following *general* definitions of "navigable waters of the United States":

§ 329.3  General policies.

Precise definitions of "navigable waters" or "navigability" are ultimately dependent on judicial interpretation, and cannot be made conclusively by administrative agencies. However, the policies and criteria contained in this regulation are in close conformance with the tests used by the Federal Courts and determinations made under this regulation are considered binding in regard to the activities of the Corps of Engineers.

§ 329.4  General definition.

Navigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce. A determination of navigability, once made, applies laterally over the entire surface of the waterbody, and is not extinguished by later actions or events which impede or destroy navigable capacity.

§ 329.5  General scope of determination.

The several factors which must be examined when making a determination whether a waterbody is a navigable water of the United States are discussed

---

**7.** The Court ordered separate trials for DeFelice's counterclaim for $100,000 against the Government's alleged "taking" of the property. That suit is still pending.

**8.** The statutory authority for the injunction is found in 33 U.S.C.A. § 406, and 33 U.S.C.A. § 1319(d), (*see* n.4, *supra*):

Every person and every corporation that shall violate any of the provisions of sections 401, 403, and 404 of this title or any rule or regulation made by the Secretary of the Army in pursuance of the provisions of section 404 of this title shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $2,500 nor less than $500, or by imprison-

ment (in the case of a natural person) not exceeding one year, or by both such punishments, in the discretion of the court. And further, the removal of any structures or parts of structures erected in violation of the provisions of the said sections may be enforced by the injunction of any district court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney General of the United States.

**9.** DeFelice conceded at trial that the canal is subject to the FWPCA, therefore a discussion of the jurisdictional scope of the FWPCA would not be dispositive of this case.

in detail below. Generally, the following conditions must be satisfied:

(a) Past, present, or potential presence of interstate or foreign commerce;

(b) Physical capabilities for use by commerce as in subparagraph (a) above; and

(c) Defined geographic limits of the waterbody.

### § 329.8 Improved or natural conditions of the waterbody.

Determinations are not limited to the natural or original condition of the waterbody. Navigability may also be found where artifical [sic] aids have been or may be used to make the waterbody sutiable [sic] for use in navigation.

(a) *Existing improvements: artifical [sic]· waterbodies.* (1) An artifical [sic] channel may often constitute a navigable water of the United States, even though it has been privately developed and maintained, or passes through private property. The test is generally as developed above, that is, whether the waterbody is capable of use to transport interstate commerce. Canals which connect two navigable waters of the United States and which are used for commerce clearly fall within the test, and themselves become navigable. A canal open to navigable waters of the United States on only one end is itself navigable where it in fact supports interstate commerce. A canal or other artifical [sic] waterbody that is subject to ebb and flow of the tide is also a navigable water of the United States.

(2) The artificial waterbody may be a major portion of a river or harbor area or merely a minor backwash, slip, or turning area. (See § 329.12(b).)

(3) Private ownership of the lands underlying the waterbody, or of the lands through which it runs, does not preclude a finding of navigability. Ownership does become a controlling factor if a privately constructed and operated canal is not used to transport interstate commerce nor used by the public; it is then not considered to be a navigable water of the United States. However, a private waterbody, even though not itself navigable, may so affect the navigable capacity of nearby waters as to nevertheless be subject to certain regulatory authorities. 33 CFR § 329.4, 329.8(a)(1) (1979).

The Supreme Court recently quoted this definition with obvious approval in *Kaiser Aetna v. United States*, 444 U.S. 164, 172 n.6, 100 S.Ct. 383, 388 n.6, 62 L.Ed.2d 332, 341 n.6 (1979). DeFelice, however, rejects the above definition of "navigability" and the District Court's apparent reliance on it to sustain Corps' jurisdiction. Instead, he maintains that the canal waters are not "navigable waters of the United States" because the canal in question is a (i) private and artificial canal and (ii) there was no factual finding to support a conclusion that the canal was a part of a "continuous waterway sustaining interstate commerce." DeFelice suggests that the correct standard of "navigability" should be a two-step finding of (i) navigability in fact and (ii) connection with a continuous waterway system—neither of which was met here. Moreover, he complains that jurisdiction should not rest on the result of an illegal act—the wrongful removal of the dam—which ultimately rendered the canal navigable in fact.

■ Neither the record [10] nor case law supports DeFelice's idea that the Corps lacks jurisdiction because the canal was artificial and are privately owned. *See, e. g., Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979) (private waterway may come within term "navigable waters of the United States if joining existing interstate commerce waterway)"; *United States v. Saxton Cove Estates, Inc.*, 526 F.2d 1293 (5th Cir. 1976) (private canals above the mean high line opening into navigable waterway subject to Corps' jurisdiction); *United States v. Joseph G. Moretti, Inc.*, 526 F.2d 1306 (5th Cir. 1976) (dredging of private canal upstream subject to Corps'

---

**10.** There is no evidence in the record for us to assume that the DeFelice family or anyone else actually owned the canal.

jurisdiction where navigable waters were affected downstream).

■ Applying DeFelice's suggested standard for the moment, we find that the record does conclusively demonstrate that Cheniere Traverse Canal is (i) tidal—a fact stipulated to by both parties, (ii) navigable in fact—has in the past, does presently or is capable of supporting transportation in interstate or foreign commerce, and (iii) connected with a continuous interstate waterway. Several witnesses who had leased campsites along the canal beginning in the early 1960s testified that their 28–30 foot Lafayette Skiff type shrimping vessels were too large to safely maneuver in other near-by water routes except in the connecting canals of Cheniere Traverse, Timbers and Wilkinson.[11] In addition, the same testimony with the aid of United States Geological Survey Maps unmistakably demonstrates that these connecting canals flow into the Gulf of Mexico and thus form a part of a continuous interstate waterway system.[12]

In reaching its decision the District Court relied on *United States v. Stoeco Homes, Inc.*, 498 F.2d 597 (3d Cir. 1974) which holds that once the artificial canals are connected to tidal water bodies, it and all its inland artificial tributaries become "navigable waters of the United States" by operation of law. *Stoeco*, 498 F.2d at 611. This Court has followed that concept in the case of *United States v. Saxton Cove Estates, Inc.*, 526 F.2d 1293 (5th Cir. 1976), where Corps' jurisdiction was upheld over five canals connecting to Black Water Sound which was a tidal water body. In urging this Court to adopt the two-step test for "navigability", DeFelice has apparently confused the requirements of "navigable waters of the United States" for tidal coastal waters, with the requirements for non-tidal inland waters. We make this assumption because of the cases which DeFelice relies on in support of this proposition.[13] These cases are inapplicable because they deal with *landlocked, non-tidal* water bodies

---

11. In addition, we observe for clarity sake that there is no requirement that a body of water sustain actual commerce in order to meet the test of navigability in fact. *Weizmann v. Dist. Eng., U. S. Army Corps of Engineers*, 526 F.2d 1302, 1305 (5th Cir. 1976). *E. g., United States v. Diamond*, 512 F.2d 157, 160 (5th Cir.), *cert. denied*, 423 U.S. 928, 96 S.Ct. 275, 46 L.Ed.2d 255 (1975). Rather, judicial interpretation recognizes that "mere capability of commercial use of a body of water suffices even if such commerce could be made possible with artificial aid." *United States v. Appalachian Power Co.*, 311 U.S. 377, 407, 61 S.Ct. 291, 299, 85 L.Ed. 243, 252 (1940). This idea was recognized as early as 1921 in *Economy Light and Power Co. v. United States*, 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847 (1921).

[A] river having the actual navigable capacity in its natural state and capable of carrying commerce among the states is within the power of Congress to preserve for purposes of future transportation, even though it is not at present used for such commerce, and be incapable of such use according to present methods, either by reason of changed conditions or because of artificial obstructions . . . The act in terms applies to "any . . . navigable river, or other navigable body of water of the United States"; and, without doing violence to its manifest purpose, we cannot limit its prohibition to such navigable waters as were, at the time of its passage, or now are, actually open to use . . .

12. The record reflects the following geographical description:

The canal is connected to Barataria Bay and the Gulf of Mexico which are tidal waterbodies and commercial waterways, by way of Wilkinson Canal, a waterway that runs in a north-south direction between Bayou Barataria and Myrtle Grove, Louisiana. The Wilkinson Canal runs through Plaquemines Parish wetlands, lakes, and bayous, with part of its course utilizing sections of bayous, particularly Bayou Dupont. This waterway is approximately 12.5 miles in length. The Timber Canal, which runs in an easterly-westerly direction connects with and crosses the Wilkinson Canal about three-quarters (0.75) of a mile south of Louisiana Highway 23 at Myrtle Grove, Louisiana. The Timber Canal connects with the canal, known locally as the Cheniere Traverse Canal or West Canal, approximately one and two tenths (1.2) of a mile easterly from the Wilkinson Canal. The site of the unauthorized canal closure in the Cheniere Traverse (or West) Canal is about two hundred (200) feet east of the Canal's junction with the Timber Canal.

13. The Court in *Minnehaha Creek Watershed Dist. v. Hoffmann*, 597 F.2d 617 (8th Cir. 1978) found that there was no RHA jurisdiction over a non-tidal inland lake located entirely within one state, Minnesota, and with only one outlet to the Mississippi River which had been continuously dammed since 1852. The Court based

where the Courts have generally required a connection with other interstate waterways [14] unless the waterway is in fact navigated regularly by vessels in commerce. As previously established Cheniere Traverse Canal is *not* landlocked, and *is* tidal. Tidal waters by their very nature form a continuous water body with interstate waterways. Requiring tidal water bodies to meet the test for non-tidal, navigable in fact water bodies (which coincidentally they do here anyway) is really to eliminate the ebb and flow test. The law is to the contrary because even shallow tidal areas, like sloughs or marshes below the elevation of a mean high water line, are subject to regulation under the 1899 RHA. *Stoeco Homes*, 498 F.2d at 597.[15]

■ We conclude that the District Court applied the correct standard of "navigability" in this case [16] and that Cheniere Traverse Canal by 1965 or 1966 became navigable by operation of law, because (i) it was subject to ebb and flow and (ii) navigable in fact because it was an arm in the flow of interstate commerce to the Gulf of Mexico.[17]

### Rising Waters?—Dam Not "Currently Serviceable"

■ The second point which DeFelice challenges concerns the Corps' interpretation of the phrase "currently serviceable" in the regulation as it applies to an exemption to the permit requirements found in 33 CFR § 322.4(c). (*See* Appendix I). The real question is can a dam which disappeared no later than 1966 be considered "currently serviceable" within the meaning of the 1977 regulation? We think not. Government witnesses testified that the Corps' interpretation of "currently serviceable" means that the structure was providing the service for which it was intended at the existing time. The Corps uses a rule of reasonableness as to how soon after a work or structure is torn out it must be replaced. A reasonable length of time is defined as a time period in which there could have been no real change in circumstances surrounding the structure. If an otherwise Corps regulated structure exists and performs a service, it may normally be maintained and repaired without individual § 10 or § 404 permits. If not, an individual permit is normally needed first, and any changed circumstance since the structure's last existence will be carefully weighed. This balanced approach is clearly reasonable. The record here indicates that there had been real changes in circumstances at the dam site. After the prior dam was removed, there was an influx of campers and fishermen who invested in campsites and boats

its holding upon the lack of an interstate waterway connection. Similarly, in *National Wildlife Federation v. Alexander*, 613 F.2d 1054 (D.C.Cir.1979), the Court held that a historical navigable, non-tidal, landlocked lake located in North Dakota was not subject to § 10 of RHA.

**14.** The inapplicability of these two cases (*see* n.13, *supra*) is further highlighted by DeFelice's reliance on the cases of *The Daniel Ball*, 77 U.S. (10 Wall) 557, 19 L.Ed. 999 (1870), and *The Genesee Chief*, 53 U.S. (12 How.) 443, 13 L.Ed. 1058 (1851) which dealt with expanding admiralty jurisdiction beyond coastal tide waters to the inland non-tidal rivers of the United States. These cases did not reject the tidal theory over coastal waters. Rather, the Court chose not to apply it because that would have unduly limited jurisdiction over inland waters.

**15.** There are numerous cases holding that ebb and flow of the tide is a valid test of navigability of tidal waters for the Corps' jurisdiction under RHA. *See Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979); *United States v. Stoeco Homes, Inc.*, 498 F.2d 597 (3rd Cir. 1974); *Leslie Salt Co. v. Froehlke*, 578 F.2d 742 (9th Cir. 1978); *Tatum v. Blackstone*, 319 F.2d 397 (5th Cir. 1963); *United States v. Saxton Co. Estates, Inc.*, 526 F.2d 1293 (5th Cir. 1976).

**16.** The Supreme Court recently conceded in *Kaiser Aetna*, that precedent does not disclose a single test or standard for navigability, but instead recognizes several distinct tests, (i) ebb and flow, (ii) connection with a continuous interstate waterway, (iii) navigable capacity, and (iv) navigable in fact. 444 U.S. at 170–172, 100 S.Ct. at 387–389, 62 L.Ed.2d at 340–41.

**17.** Having illustrated that Corps jurisdiction occurred by operation of law, we find no merit in DeFelice's argument that jurisdiction was improperly created due to an unauthorized or illegal act. Besides, DeFelice presented no evidence at trial pertaining to this issue and on appeal has failed to cite any law to support his position.

for their pleasure as well as commercial fishing based on the navigability of the canal. Considering the facts (i) changed circumstances, and (ii) that prior to DeFelice's attempt to ever bring suit, the dam had not been in existence for at least nine years, the Court upheld the Corps' interpretation of its regulations as a reasonable one. The reasonable interpretation by an agency of its own regulations is allowed great deference. *Udall v. Tallmann*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1955); *Soliz v. Plunkett*, 615 F.2d 272 (5th Cir. 1980); *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260 (5th Cir. 1978); *Bone v. Hibernia Bank*, 493 F.2d 135 (5th Cir. 1974). The District Court's finding that this interpretation is reasonable is another way of saying it was not arbitrary, capricious or an abuse of discretion. We affirm this finding as well.[18]

18. Related to the above argument, that DeFelice is exempt by regulation from obtaining the permit required by § 10 of the RHA of 1899, is the argument by DeFelice that he is exempt by regulations from obtaining a permit required by § 404 of the FWPCA, 33 U.S.C.A. 1344 (*see* n.4, *supra*). DeFelice admits that the permit required by 33 U.S.C.A. § 1344 would be applicable to the fill he was dumping into the canal but for an alleged exemption in the regulation. DeFelice relies on 33 CFR 209.120e(2)(iii) (1976) which language was carried over into the 1977 regulations.

**§ 209.120 Permits for activities in Navigable Waters or Ocean Waters.**

(e) *Activities Requiring Authorizations.* (1) Structures or work in navigable waters of the United States. Department of the Army authorizations are required under the River and Harbor Act of 1899 (See paragraph (b) of this section) for all structures or work in navigable waters of the United States except for bridges and causeways (see Appendix A), the placement of aids to navigation by the U. S. Coast Guards, structures constructed in artificial canals within principally residential developments where the canal has been connected to a navigable water of the United States (see paragraph (g)(11) of this section), and activities that were commenced or completed shoreward of established harbor lines before May 27, 1970 (see 33 CFR § 209.150) other than those activities involving the discharge of dredged or fill material in navigable waters after October 18, 1972.

(2) *Discharges of dredged material or of fill material into navigable waters.* (i) Except as provided in subparagraphs (2)(ii) and (iii) of this paragraph, Department of the Army permits will be required for the discharge of dredged material or of fill material into navigable waters in accordance with the following phased schedule:

(iii) Discharges of dredged or fill material in waters other than navigable waters of the United States that have been completed by the effective date of this regulation and discharges of dredged or fill material of less than 500 cubic yards into waters other than navigable waters of the United States that are part of an activity that was commenced before the publication of this regulation, that will be completed within six months of the publication of this regulation, and that involves a single and complete project and not a number of projects associated with complete development plans are hereby authorized for purposes of Section 404 of the Federal Water Pollution Control Act without further processing under this regulation: *Provided, however,* That the exemption of these types of activities from the requirements of this regulation shall not be construed as a waiver of the requirement to obtain a State water-quality certification under section 401 of the Federal Water Pollution Control Act or a certification of compliance with a State's approved coastal zone management program pursuant to section 307(c)(3) of the Coastal Zone Management Act in those cases where the discharge of dredged or fill material has not been completed by the date of this regulation: *And further provided,* That the procedures of this regulation shall apply to any activity involving the discharge of dredged or fill material commenced before the date of this regulation if the District Engineer determines that the interests of water quality as expressed in the guidelines (see 40 CFR Part 230) so require. The term "commenced" as used herein shall be satisfied if there has been, before the date of this regulation, some discharge of dredged or fill material into the navigable water as a part of the above activity or an entering into of a written contractual obligation to have the dredged or fill material discharged at a designated disposal site by a contractor.

This regulation is obviously inapplicable. It provides that discharges of fill material, completed prior to the effective date of the regulation, "into waters other than navigable waters of the United States that were part of an activity which commenced before the publication of the regulation, that will be completed within six months of the publication of this regulation" are authorized for purposes of § 404 FWPCA. DeFelice's activities were neither completed before the effective date of the regulation, nor started six months before publication of the regulation. Nor was the discharge into "waters other than navigable waters of the United States."

DeFelice's action in placing fill materials into the Cheniere Traverse Canal—a "navigable water of the United States"—without a permit, evoked the Corps' jurisdiction and constituted a clear violation of RHA and FWPCA. Because we find no applicable exemptions in this case to the permit requirements, we uphold the District Court in all of its findings and judgment.

AFFIRMED.

## APPENDIX I

After July 19, 1977, the following regulations, 33 C.F.R. 320, 321, 322, 323, in pertinent part, were in effect:

## PART 320—GENERAL REGULATORY POLICIES

Sec.

320.1 Purpose and scope.

320.2 Authorities to issue permits.

320.3 Related legislation.

320.4 General policies for evaluating permit applications.

AUTHORITY: 33 U.S.C. 401 et seq.; 33 U.S.C. 1344; 33 U.S.C. 1413.

SOURCE: 42 FR 37133, July 19, 1977, unless otherwise noted.

### § 320.1 Purpose and scope.

(a) *Types of activities regulated.* This regulation and the regulations that follow (33 CFR 321–329) prescribe the statutory authorities, and general and special policies and procedures applicable to the review of applications for Department of the Army permits for various types of activities that occur in waters of the United States or the oceans. This part identifies the various Federal statutes that require Department of the Army permits before these activities can be lawfully undertaken; the related

Federal legislation applicable to the review of each activity that requires a Department of the Army permit; and the general policies that are applicable to the review of all activities that require Department of the Army permits. Parts 321–324 address the various types of activities that require Department of the Army permits, including special policies and procedures applicable to those activities as follows:

(1) Dams or dikes in navigable waters of the United States (Part 321);

(2) All other structures or work including excavation, dredging, and/or disposal activities, in navigable waters of the United States (Part 322);

(3) All activities that alter or modify the course, condition, location, or capacity of a navigable water of the United States (Part 322);

(4) Construction of fixed structures and artificial islands on the outer continental shelf (Part 322);

(5) All discharges of dredged or fill material into the waters of the United States (Part 323); and

(6) All activities involving the transportation of dredged material for the purpose of dumping it in ocean waters (Part 324).

\*      \*      \*      \*      \*      \*

"navigable waters of the United States" and "waters of the United States" are used frequently throughout these regulations, and it is important that the reader understand the difference from the outset. "Navigable waters of the United States" are defined in 33 CFR 329. These are the traditional waters where permits are required for work or structures pursuant to

---

Substantially the same permission for "replacement of any previously authorized, currently serviceable fill" is applicable to § 404 of the FWPCA, as was applicable to permits required under § 10 of the RHA of 1899. However, for the same reasons as those stated in the text above, the fill deposited by DeFelice in July 1977 would not be replacement of "currently serviceable" fill for purposes of § 404 of the FWPCA for the same reason it was not "currently serviceable" for purposes of § 10 permit. It is clear that DeFelice is not exempt

from the permit requirement by § 404 FWPCA. Therefore, this is an independent ground to support the judgment of the District Court.

DeFelice also argues that the regulations published July 19, 1977, 42 Fed.Reg. 37122 *et seq.*, are inapplicable because they could not go into effect for thirty days after publication. This argument is irrelevant because the District Court has determined, as we do, that DeFelice violated the statutes, §§ 9, 10 of the RHA and § 404 of the FWPCA, which must stand even if there were no regulations involved.

sections 9 and 10 of the River and Harbor Act of 1899. "Waters of the United States" are defined in 33 CFR 323.2(a). These waters include more than navigable waters of the United States and are the waters where permits are required for the discharge of dredged or fill material pursuant to section 404 of the Federal Water Pollution Control Act Amendments of 1972.

\* \* \* \* \* \*

§ 320.2 **Authorities to issue permits.**

(a) Section 9 of the River and Harbor Act approved March 3, 1899 (30 Stat. 1151; 33 U.S.C. 401) (hereinafter referred to as Section 9) prohibits the construction of any dam or dike across any navigable water of the United States in the absence of Congressional consent and approval of the plans by the Chief of Engineers and the Secretary of the Army. Where the navigable portions of the waterbody lie wholly within the limits of a single State, the structure may be built under authority of the legislature of that State, if the location and plans or any modification thereof, are approved by the Chief of Engineers and by the Secretary of the Army. The instrument of authorization is designated a permit. Section 9 also pertains to bridges and causeways but the authority of the Secretary of the Army and Chief of Engineers with respect to bridges and causeways was transferred to the Secretary of Transportation under the Department of Transportation Act of October 15, 1966 (80 Stat. 941, 49 U.S.C. 1155g(6)(A)). See also 33 CFR Part 321. A Department of the Army authorization is required for the discharge of dredged or fill material into waters of the United States associated with bridges and causeways pursuant to Section 404 of the Federal Water Pollution Control Act Amendments of 1972 (33 U.S.C. 1344). See CFR Part 323.

(b) Section 10 of the River and Harbor Act approved March 3, 1899 (30 Stat. 1151; 33 U.S.C. 403) (hereinafter referred to as section 10) prohibits the unauthorized obstruction or alteration of any navigable water of the United States. The construction of any structure in or over any navigable water of the United States, the excava-

tion from or depositing of material in such waters, or the accomplishment of any other work affecting the course, location, condition, or capacity of such waters, is unlawful unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army. The instrument of authorization is designated a permit, general permit, or letter of permission. The authority of the Secretary of the Army to prevent obstructions to navigation in the navigable waters of the United States was extended to artificial islands and fixed structures located on the outer continental shelf by Section 4(f) of the Outer Continental Shelf Lands Act of 1953 (67 Stat. 463; 43 U.S.C. 1333(f)). See also 33 CFR Part 322.

\* \* \* \* \* \*

(g) Section 404 of the Federal Water Pollution Control Act Amendments of 1972 (PL 92–500, 86 Stat. 816, 33 U.S.C. 1344) (hereinafter referred to as Section 404) authorizes the Secretary of the Army, acting through the Chief of Engineers, to issue permits, after notice and opportunity for public hearings, for the discharge of dredged or fill material into the waters of the United States at specified disposal sites. See 33 CFR 323. The selection and use of disposal sites will be in accordance with guidelines developed by the Administrator of the Environmental Protection Agency (EPA) in conjunction with the Secretary of the Army, published in 40 CFR Part 230.

\* \* \* \* \* \*

33—Navigation and Navigable Waters

**PART 321—PERMITS FOR DAMS AND DIKES IN NAVIGABLE WATERS OF THE UNITED STATES**

Sec.

321.1  General.

321.2  Definitions.

321.3  Special policies and procedures.

AUTHORITY: 33 U.S.C. 401.

SOURCE: 42 FR 37138, July 19, 1977, unless otherwise noted.

§ 321.3  **Special policies and procedures.**

The following additional special policies and procedures shall be applicable to the evaluation of permit applications under this regulation:

(a) The Secretary of the Army will decide whether Department of the Army authorization for a dam or dike in a navigable water of the United States will be issued, since this authority has not been delegated to the Chief of Engineers. The conditions to be imposed in any instrument of authorization will be recommended by the District Engineer when he forwards his report to the Secretary of the Army, through the Chief of Engineers, pursuant to 33 CFR 325.11.

(b) A Department of the Army application under Section 9 will not be processed until the approval of the United States Congress has been obtained if the navigable water of the United States is an interstate waterbody, or until the approval of the appropriate State legislature has been obtained if the navigable water of the United States is solely within the boundaries of one State.

## PART 322—PERMITS FOR STRUCTURES OR WORK IN OR AFFECTING NAVIGABLE WATERS OF THE UNITED STATES

Sec.

322.1  General.

322.2  Definitions.

322.3  Activities requiring permits.

322.4  Structures and work permitted by this regulation.

322.5  Special policies and procedures.

Appendix A—U. S. Coast Guard/Chief of Engineers Memorandum of Agreement.

Appendix B—Delegation of Authority.

AUTHORITY: 33 U.S.C. 403.

SOURCE: 42 FR 37139, July 19, 1977, unless otherwise noted.

### § 322.3  Activities requiring permits.

(a) *General.* Department of the Army permits are required under Section 10 for all structures or work in or affecting navigable waters of the United States except for bridges and causeways (see Appendix A) and structures or work licensed under the Federal Power Act of 1920. Activities that were commenced or completed shoreward of established Federal harbor lines before May 27, 1970 (see 33 CFR Part 328) also do not require Section 10 permits; However, if those activities involve the discharge of dredged or fill material into waters of the United States after October 18, 1972, a Section 404 permit is required (see 33 CFR Part 323).

(1) Structures or work are in the navigable waters of the United States if they are within limits defined in 33 CFR Part 329. Structures or work outside these limits are subject to the provisions of law cited in paragraph (a) above, if these structures or work affect the course, location, or condition of the waterbody in such a manner as to impact on the navigable capacity of the waterbody. For purposes of a Section 10 permit, a tunnel or other structure under or over a navigable water of the United States is considered to have an impact on the navigable capacity of the waterbody.

\*　　\*　　\*　　\*　　\*　　\*

### § 322.4  Structures and work permitted by this regulation.

The following structures or work are hereby permitted for purposes of Section 10 and do not require separate Department of the Army permits:

(a) The placement of aids to navigation by the U. S. Coast Guard; see § 322.5(e), below;

(b) Structures constructed in artificial canals within principally residential developments where the connection of the canal to a navigable water of the United States has been previously authorized; see § 322.5(G), below;

(c) The repair, rehabilitation, or replacement of any previously authorized, currently serviceable, structure or of any currently serviceable structure constructed prior to the requirement for authorization; provided such repair, rehabilitation, or replacement does not result in a deviation from the plans of the original structure, and further provided that the structure to be maintained has not been put to uses differing

from uses specified for it in any permit authorizing its original construction;

(d) Marine life harvesting devices such as pound nets, crab traps, eel pots, lobster traps, provided there is no interference with navigation;

(e) Staff gages, tide gages, water recording devices, water quality testing and improvement devices, and similar scientific structures provided there is no interference with navigation;

(f) Survey activities including core sampling; and

(g) Structures or work completed before 18 December 1968 or in waterbodies over which the District Engineer has not asserted jurisdiction provided there is no interference with navigation.

§ 322.5 Special policies.

The Secretary of the Army has delegated to the Chief of Engineers the authority to issue or deny Section 10 permits. (See Appendix B.) The following additional special policies and procedures shall also be applicable to the evaluation of permit applications under this regulation.

(a) *General.* Department of the Army permits will be required for structures or work in or affecting navigable waters of the United States. Certain structures or work specified in § 322.4 are permitted by this regulation. If a structure or work is not permitted by this regulation, an individual or general Section 10 permit will be required.

\* \* \* \* \* \*

of the impact of the proposed work on navigation and national security. The public notice will so identify the criteria.

(g) *Canals and other artificial waterways connected to navigable waters of the United States.* (1) A canal or similar artificial waterway is subject to the regulatory authorities discussed in § 322.3, above, if it constitutes a navigable water of the United States, or if it is connected to navigable waters of the United States in a manner

which affects their course, condition, or capacity. In all cases the connection to navigable waters of the United States requires a permit. Where the canal itself constitutes a navigable water of the United States, evaluation of the permit application and further exercise of regulatory authority will be in accordance with the standard procedures of this regulation. For all other canals the exercise of regulatory authority is restricted to those activities which affect the course, condition, or capacity of the navigable waters of the United States. Examples of the latter may include the length and depth of the canal; the currents, circulation, quality and turbidity of its waters, especially as they affect fish and wildlife values; and modifications or extensions of its configuration.

\* \* \* \* \* \*

PART 323—PERMITS FOR DISCHARGES OF DREDGED OR FILL MATERIAL INTO WATERS OF THE UNITED STATES

Sec.

323.1 General.

323.2 Definitions.

323.3 Activities requiring permits.

323.4 Discharges permitted by this regulation.

323.4-1 Discharges prior to effective dates of phasing.

323.4-2 Discharges into certain waters of the United States.

323.4-3 Specific categories of discharges.

323.4-4 Discretionary authority to require individual or general permits.

323.5 Special policies and procedures.

Appendix A—Delegation of authority.

AUTHORITY: 33 U.S.C. 1344.

SOURCE: 42 FR 37144, July 19, 1977, unless otherwise noted.

§ 323.2 Definitions.

For the purpose of this regulation, the following terms are defined:

(a) The term "waters of the United States" means: [1]

---

1. The terminology used by the FWPCA is "navigable waters" which is defined in Section

502(7) of the Act as "waters of the United States including the territorial seas." For pur-

(1) The territorial seas with respect to the discharge of fill material. (The transportation of dredged material by vessel for the purpose of dumping in the oceans, including the territorial seas, at an ocean dump site approved under 40 CFR 228 is regulated by Section 103 of the Marine Protection, Research and Sanctuaries Act of 1972, as amended (33 U.S.C. 1413). See 33 CFR 324. Discharges of dredged or fill material into the territorial seas are regulated by Section 404.):

(2) Coastal and inland waters, lakes, rivers, and streams that are navigable waters of the United States, including adjacent wetlands;

(3) Tributaries to navigable waters of the United States, including adjacent wetlands (manmade nontidal drainage and irrigation ditches excavated on dry land are not considered waters of the United States under this definition).

(4) Interstate waters and their tributaries, including adjacent wetlands; and

(5) All other waters of the United States not identified in paragraphs (1)–(4) above, such as isolated wetlands and lakes, intermittent streams, prairie potholes, and other waters that are not part of a tributary system to interstate waters or to navigable waters of the United States, the degrada-

tion or destruction of which could affect interstate commerce.[2]

### Title 33—Navigation and Navigable Waters

The landward limit of jurisdiction in tidal waters, in the absence of adjacent wetlands, shall be the high tide line and the landward limit of jurisdiction and all other waters, in the absence of adjacent wetlands, shall be the ordinary high water mark.

(b) The term "navigable waters of the United States" means those waters of the United States that are subject to the ebb and flow of the tide shoreward to the mean high water mark (mean higher high water mark on the Pacific coast) and/or are presently used, or have been used in the past, or may be susceptible to use to transport interstate or foreign commerce. (See 33 CFR 329 for a more complete definition of this term.)

\*     \*     \*     \*     \*     \*

(m) The term "fill material" means any material used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of a waterbody. The term does not include any pollutant discharged into the water primarily to dispose of waste, as that activity is regulated under Section 402 of the Federal

poses of clarity, and to avoid confusion with other Corps of Engineers regulatory programs, the term "waters of the United States" is used throughout this regulation.

2. In defining the jurisdiction of the FWPCA as the "waters of the United States," Congress, in the legislative history to the Act, specified that the term "be given the broadest constitutional interpretation unencumbered by agency determinations which would have been made or may be made for administrative purposes." The waters listed in paragraphs (a)(1)–(4) fall within this mandate as discharges into those waterbodies may seriously affect water quality, navigation, and other Federal interests; however, it is also recognized that the Federal government would have the right to regulate the waters of the United States identified in paragraph (a)(5) under this broad Congressional mandate to fulfill the objective of the Act: "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" (Section 101(a)). Paragraph (a)(5) incorporates all other waters of the United States that could be regulated under the Federal government's Con-

stitutional powers to regulate and protect interstate commerce, including those for which the connection to interstate commerce may not be readily obvious or where the location or size of the waterbody generally may not require regulation through individual or general permits to achieve the objective of the Act. Discharges of dredged or fill material into waters of the United States identified in paragraphs (a)(1)(4) will generally require individual or general permits unless those discharges occur beyond the headwaters of a river or stream or in natural lakes less than 10 acres in surface area. Discharges into these latter waters and into most of the waters identified in paragraph (a)(5) will be permitted by this regulation, subject to the provisions listed in paragraph 323.4–2(b) unless the District Engineer develops information, on a case-by-case basis, that the concerns for the aquatic environment as expressed in the EPA Guidelines (40 CFR 230) require regulation through an individual or general permit. (See 323.4–4).

Water Pollution Control Act Amendments of 1972.

(n) The term "discharge of fill material" means the addition of fill material into waters of the United States. The term generally includes, without limitation, the following activities: Placement of fill that is necessary to the construction of any structure in a water of the United States; the building of any structure or impoundment requiring rock, sand, dirt, or other material for its construction; site-development fills for recreational, industrial, commercial, residential, and other uses; causeways or road fills; dams and dikes; artificial islands; property protection and/or reclamation devices such as riprap, groins, seawalls, breakwaters, and revetments; beach nourishment; levees; fill for structures such as sewage treatment facilities, intake and outfall pipes associated with power plants and subaqueous utility lines; and artificial reefs. The term does not include plowing, cultivating, seeding and harvesting for the production of food, fiber, and forest products.

\* \* \* \* \* \*

## § 323.3 Discharges requiring permits.

(a) *General.* Department of the Army permits will be required for the discharge of dredged or fill material into waters of the United States. Certain discharges specified in §§ 323.4–1, 323.4–2 and 323.4–3 are permitted by this regulation. If a discharge of dredged or fill material is not permitted by this regulation, an individual or general Section 404 permit will be required for the discharge of dredged or fill material into waters of the United States in accordance with the following phased schedule:

(1) Before July 25, 1975, discharges into navigable waters of the United States.

(2) After July 25, 1975, discharges into navigable waters of the United States and adjacent wetlands.

(3) After September 1, 1976, discharges into navigable waters of the United States and their primary tributaries, including adjacent wetlands, and into natural lakes, greater than 5 acres in surface area. (See also § 323.4–2 for discharges that are permitted by this regulation.)

(4) After July 1, 1977, discharges into all waters of the United States. (See also § 323.4–2 for discharges that are permitted by this regulation.)

(b) *Individual permits.* Unless permitted by this regulation (§§ 323.4–1, 323.4–2 and 323.4–3) or authorized by general permits (§ 323.3(c)), the discharge of dredged or fill material into waters of the United States will require an individual Department of the Army permit issued in accordance with the policies in § 320.4 and procedures in 33 CFR Part 325.

\* \* \* \* \* \*

## § 323.4 Discharges permitted by this regulation.

(a) *General.* Discharges of dredged or fill material specified in §§ 323.4–1, 323.4–2 and 323.4–3, below are hereby permitted for purposes of Section 494 without further processing under this regulation (individual applications are not needed), except as provided in § 323.4–4 below. Permits may, however, be required under Section 10 of the River and Harbor Act of 1899 (see 33 CFR 322). Sections 323.4–1, 323.4–2, and 323.4–3 do not obviate the requirement to obtain State or local assent required by law for the activities permitted therein.

## § 323.4–1 Discharges prior to effective dates of phasing.

(a) Discharges of dredged or fill material in waters of the United States that occur before the phase-in dates specified in § 323.-3(a)(2)–(4) above are hereby permitted for purposes of Section 404, provided the conditions in paragraph (c) below are met.

(b) Discharges of dredged or fill material of less than 500 cubic yards into waters other than navigable waters of the United States (see 33 CFR 329) that are part of an activity that was commenced before July 25, 1975, that were completed by January 25, 1976, and that involve a single and complete project and not a number of projects associated with a complete development plan are hereby permitted for purposes of

Section 404, provided the conditions in paragraph (c) below are met. The term "commenced" as used herein shall be satisfied if there has been, before July 25, 1975, some discharge of dredged or fill material as a part of the above activity or an entering into of a written contractual obligation to have the dredged or fill material discharged at a designated disposal site by a contractor.

(c) For the purposes of Section 404, the following conditions must have been satisfied for the discharges occurring before the dates specified in paragraph (a) and (b) above:

(1) That the discharge was not located in the proximity of a public water intake;

(2) That the discharge did not contain unacceptable levels of pathogenic organisms in areas used for recreation involving physical contact with the water;

(3) That the discharge did not occur in areas of concentrated shellfish production; and

(4) That the discharge did not destroy or endanger the critical habitat or a threatened or endangered species, as identified under the Endangered Species Act.

§ 323.4-3 Specific categories of discharges.

(a) The following discharges of dredged or fill material into waters of the United States are hereby permitted for purposes of Section 404, provided the conditions specified in this paragraph and paragraph (b) below are met:

\* \* \* \* \* \*

(5) The repair, rehabilitation or replacement of any previously authorized, currently serviceable fill, or of any currently serviceable fill discharged prior to the requirement for authorization; provided such repair, rehabilitation or replacement does not result in a deviation from the specifications of the original work, and further provided that the fill to be maintained has not been put to uses differing from uses specified for it in any permit authorizing its original construction.