John **BUTTREY**, et al.

v.

**UNITED STATES of America**, et al.

**Civ. A. No. 81–263.**

United States District Court,
E.D. Louisiana.

Sept. 28, 1983.

Deutsch, Kerrigan & Stiles, Charles K. Reasonover, Pamela Pryor Mehle, Howard J. Ettinger, New Orleans, La., for plaintiffs.

Nancy S. Bryson, William L. Want, Pollution Control Section, Land & Natural Resources Div., Dept. of Justice, Washington, D.C., Joseph A. Gonzales, U.S. Army Corps of Engineers, Mobile, Ala., for defendants.

## OPINION

ARCENEAUX, District Judge.

This matter arises out of a long-standing dispute, apparently heavily infected with animosity, between residential developer John Buttrey and John Buttrey Developments, Inc. (hereinafter collectively referred to as "Buttrey") and the United States Army Corps of Engineers (hereinafter "the Corps") over various projects undertaken in connection with the development of the Magnolia Forest subdivision near Slidell, Louisiana.[1] Mr. Buttrey's 1978 application for a dredge and fill permit for the channelization of a portion of Gum Bayou, which borders the subdivision, resulted in a prior lawsuit. *Buttrey v. United States*, No. 80–1617 (E.D.La. March 31, 1981) (hereinafter "Buttrey I"). The Fifth Circuit Court of Appeals recently affirmed this Court's decision in that matter, holding that the Corps had jurisdiction to require the permit, that the Corps's procedures in processing the permit application were not constitutionally infirm, and that the permit was properly denied on the basis of the administrative record. *Buttrey v. United States*, 690 F.2d 1170 (5th Cir.1982), *cert. denied,* — U.S. ——, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983).

The instant suit concerns two cease and desist orders, one concerning a sewage treatment plant constructed without obtaining a dredge and fill permit, and the other concerning the excavation of a pond without a permit. Buttrey filed a complaint for declaratory and injunctive relief on January 21, 1981, which challenged the constitutionality of (1) the Congressional grant of jurisdiction over civilian activities to the Corps; (2) the Corps's jurisdiction over the sewage treatment plant; (3) the Corps's jurisdiction over the pond excavation; (4) the legality of the Corps's inspection of Buttrey's property and surveillance of his activities; and, (5) the Corps's refusal to allow Buttrey access to its files on those matters. Buttrey moved for summary judgment on the first four counts of the complaint, and the Corps countered with a motion for summary judgment on the first count and for dismissal of the remaining counts. Buttrey's motion for summary judgment was denied. The Court granted the Corps's motion for summary judgment on the constitutionality of the Corps's juris-

---

1. Buttrey's dispute is with the Mobile, Alabama district office of the Corps. Subsequent to the filing of this suit, regulatory functions for the area in question were transferred from the Mobile District to the Vicksburg, Mississippi District of the Corps. All pending applications and enforcement actions, however, were to be processed to completion by the Mobile District under the transfer agreement. *See,* Corps Exh. A–3, p. 5.

diction over civilians, which decision was affirmed on interlocutory appeal. *See, Buttrey v. United States,* 690 F.2d 1186 (5th Cir.1982). The Court also granted the Corps's motion to dismiss Count 5 of the complaint as moot, the Corps having turned over its files to Buttrey after the institution of this suit.

The Court denied the motion to dismiss Counts 2 through 4, but, following the procedure used in *Avoyelles Sportsmen's League v. Alexander,* 511 F.Supp. 278, 281 (W.D.La.1981), rev'd on other grounds, sub. nom. *Avoyelles Sportsmen's League v. Marsh,* 715 F.2d 897 (5th Cir.1983), reserved its jurisdiction over the remaining counts and ordered the Corps to conduct administrative proceedings on the issue of its jurisdiction over the two projects in question. *See also, United States v. Moretti,* 478 F.2d 418, 432 (5th Cir.1973). Buttrey voluntarily dismissed the surveillance count, leaving only the issue of the two cease and desist orders.

On June 28, 1982, nine months after being ordered to do so, the Corps filed its jurisdictional findings with the Court, finding jurisdiction over the sewage treatment plant under Section 404 of the Clean Water Act, 33 U.S.C. § 1344 (hereinafter "Clean Water Act"), and over the pond under Section 10 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 403 (hereinafter "Rivers and Harbors Act"). Buttrey filed for review of the findings; this was had on September 15, 1982 and taken under submission. After reviewing the briefs, the record, and the applicable law, the Court now rules on the motion for review.

To determine that the Corps acted within the scope of its jurisdiction, the Court need only find "that the Corps 'could reasonably have believed' that the factual predicate necessary to its assertion of authority existed". *Buttrey I,* 690 F.2d at 1185–86, citing *Citizens to Preserve Overton Park,*

*Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). At that point, the factual findings that form the basis of the Corps's decision become reviewable under the "arbitrary and capricious" standard. *Id.,* at 1186.

> Under this standard of review, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment". *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). We also bear in mind, as the Supreme Court has emphasized, that "[a]lthough this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. [A] court is not empowered to substitute its judgment for that of the agency". *Id.*

*Buttrey I,* 690 F.2d at 1183–84. The Court is confined to the administrative record in making this determination. *Id.,* at 1184. Based on the administrative record, the Court finds that the Corps abused its discretion in finding jurisdiction over the sewage treatment plant and the pond under the applicable regulations.[2]

## I—THE SEWAGE TREATMENT PLANT

On May 5, 1980, three days after suit was filed in *Buttrey I,* the Corps issued the following cease and desist order:

> The work that you have performed in connection with the placement of fill and dredged material into the wetlands adjacent to Gum Bayou, during the construction of a sewage treatment plant and excavation of drainage ditches, in the Magnolia Forest Subdivision Sections 19 and 30, T. 8S., R. 15E., Slidell, St. Tammany Parish, LA is regulated by the Federal permitting authority of this office.

---

**2.** The Court has applied the "arbitrary and capricious" standard in reviewing the administrative record of this proceeding, but notes the possible propriety of a less stringent standard ("substantial evidence") or a *de novo* review

announced in *Avoyelles, supra,* 715 F.2d 897 at 905–06. Since application of the stringent standard has guided the Court, using either of the lesser standards would have obviously produced the same result.

Initiating the work without first obtaining a permit is in violation of Section 404 of the Clean Water Act of 1977 (33 USC 1344). In essence, Section 404 prohibits the discharge of dredged or fill material into "waters of the United States" unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army pursuant to a permit. "Waters of the United States", as defined administratively, include all coastal and fresh water wetlands both above and below the mean high or ordinary high water line or those adjacent to other navigable waters of the United States and their system of tributaries . . . .

You are hereby directed to cease and desist all activities of this nature immediately and to notify this office in writing within 10 days of receipt of this letter as to why the work was commenced without a permit.

(R., Doc. 9, Exh. A). The Corps's regulations define "wetlands" as:

those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, and bogs and similar areas.

33 C.F.R. § 323.2(c) (1982).

This Court has already found that the vicinity of Gum Bayou is a wetland and this point is not seriously disputed. *See, Buttrey I*, 690 F.2d at 1185. It is also undisputed that the sewage treatment plant was constructed some time after September 1, 1976, but that the site was filled between July 25, 1975 and September 1, 1976. Buttrey has never applied for a permit. The plant is located on Gum Bayou, a small, slow-running stream that converges with the West Pearl River about two miles downstream from the plant. At the point where the sewage treatment plant is located, the Bayou runs roughly parallel to the river and the distance between them is about two miles in a direct line. The Magnolia Forest subdivision is situated between the plant and the river. (*See* Buttrey Exhs. 4, 13a; Corps Exh. 3c). The issue before the Court is whether the plant is located in a wetland adjacent to the West Pearl River or whether it is situated in a wetland adjacent to a tributary of the West Pearl River (Gum Bayou).

Section 404 of the Clean Water Act requires Department of the Army permits, issued by the Secretary of the Army acting through the Corps, for the discharge of dredge and fill materials into "navigable waters". 33 U.S.C. § 1344(a) and (c). Navigable waters are defined as "the waters of the United States, including the territorial seas". 33 U.S.C. § 1362(7). After the passage of the Clean Water Act, however, the Corps continued to limit its regulatory jurisdiction to waters over which it had traditionally asserted jurisdiction under the Rivers and Harbors Act. In *Natural Resources Defense Council, Inc. v. Callaway*, the court found that the Corps had acted in derogation of its authority by continuing to use the limited definition of navigability, and ordered it to publish new regulations "clearly recognizing the full regulatory mandate of the Water Act". 392 F.Supp. 685, 686 (D.D.C.1975). In response, the Corps promulgated regulations which phased in the expansion of its jurisdiction:

§ 323.3 Discharges requiring permits.

(a) *General.* Department of the Army permits will be required for the discharge of dredged or fill material into waters of the United States. Certain discharges specified in §§ 323.4–1, 323.-4–2 and 323.4–3 are permitted by this regulation. If a discharge of dredged or fill material is not permitted by this regulation, an individual or general Section 404 permit will be required for the discharge of dredged or fill material into waters of the United States in accordance with the following phased schedule:

(1) Before July 25, 1975, discharges into navigable waters of the United States.

(2) After July 25, 1975, discharges into navigable waters of the United States and adjacent wetlands.

(3) After September 1, 1976,[3] discharges into navigable waters of the United States and their primary tributaries, including adjacent wetlands, and into natural lakes, greater than 5 acres in surface area. (See also § 323.4–2 for discharges that are permitted by this regulation.)

(4) After July 1, 1977, discharges into all waters of the United States. (See also, § 323.4–2 for discharges that are permitted by this regulation).

33 C.F.R. § 323.3(a) (1982).

Buttrey argues that Gum Bayou, a non-navigable stream, is a primary tributary of the navigable West Pearl River, and that the sewage treatment plant is situated in wetlands adjacent to Gum Bayou. Thus, Buttrey claims that the Corps did not gain jurisdiction over the plant site until September 1, 1976 under phase three, after the fill had already been placed. The Corps bases its jurisdiction on a finding that the plant is located in a wetland adjacent to the West Pearl River, such that jurisdiction over the site was acquired on July 25, 1975. In effect, it is the Corps's position that Gum Bayou is not a tributary, for the purposes of its "phase in" regulations, but that Gum Bayou is, instead, itself wetlands adjacent to the West Pearl River, which river is "navigable waters".

The Corps's regulations define adjacent:

(d) The term "adjacent" means bordering, contiguous, or neighboring. Wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are "adjacent wetlands".

33 C.F.R. § 323.2(d) (1982). The Corps bases its finding on (1) the uninterrupted physical connection of Gum Bayou with the West Pearl River from the site of the plant to Gum Bayou's confluence with the West Pearl River, some two miles distant, and (2) the fact that the bayou is influenced by the backwaters of the river and overflowed by frequent flooding on the river. (See, Findings and Determinations of Jurisdiction as to Sewage Treatment Plant Owned by Mr. John Buttrey (hereinafter "Findings"), R., Doc. 29, p. 19).

The Corps relies on the case of *United States v. Lee Wood Contracting, Inc.*, 529 F.Supp. 119 (E.D.Mich.1981) in support of its first argument. There, the district court rejected a magistrate's finding that a ditch was not a wetland adjacent to the Quanicassee River because the wetland vegetation was not continuous from the ditch to the river, and the two were separated by several large land parcels and farms. The district court reasoned that the regulatory definition was stated in the alternative, so that, even though the wetlands were not "contiguous" to a body of navigable water, they were "adjacent" because there was a direct water connection between them. This Court notes that the *Lee Wood* opinion concluded that the ditch was adjacent to the Quanicassee River rather than Lake Huron, of which the river was found to be a tributary. Should the Court have found that the ditch was adjacent to Lake Huron by virtue of its direct water connection, and found jurisdiction under Section 323.3(a)(2), then it would have effectively deprived Section 323.3(a)(3) of any meaning, for the ditch would have been an (a)(2) "tributary" and not "adjacent" for purposes of (a)(3). However, the Court did not do this, but based jurisdiction on Section 323.3(a)(3), finding the ditch to be adjacent to the tributary. The Court does not consider *Lee Wood* to be of assistance to the Corps if Gum Bayou itself is a tributary of the West Pearl River.

Nor does *United States v. Tilton*, No. 81–27 (M.D.Fla. January 8, 1982), *aff'd*, 705 F.2d 429 (11th Cir.1983), support the Corps.

---

**3.** Phase II was to begin on July 1, 1976 under the regulations as originally issued. However, on July 2, 1976, the President directed the Secretary of the Army to delay the implementation of Phase II until September 1, 1976. *See,* Caplin,

Is Congress Protecting Our Water? The Controversy Over Section 404, Federal Water Pollution Control Act Amendments of 1972, 31 U.Miami L.Rev. 445, 466–67 (1977).

There, a wetland, separated from a navigable river by an earthen berm about thirty feet in width, was found to be "adjacent". The definition of adjacent specifically states that wetlands separated from other waters by berms are "adjacent". No berm is involved here. Gum Bayou would appear to be a "tributary" of the West Pearl River, rather than "wetlands adjacent" to that stream.

The regulations define "primary tributaries" as follows:

(j) The term "primary tributaries" means the main stems of tributaries directly connecting to navigable waters of the United States up to their headwaters, and does not include any additional tributaries extending off of the main stems of these tributaries.

33 C.F.R. § 323.2(j) (1982).

(i) The term "headwaters" means the point on a nontidal stream above which the average annual flow is less than five cubic feet per second. The District Engineer may estimate this point from available data by using the mean annual area precipitation, area drainage basin maps, and the average runoff coefficient, or by similar means.

33 C.F.R. § 323.2(i) (1982). The regulations do not define the term "tributary", but Webster's Third New International Dictionary defines it as "a: a stream feeding into a larger stream or a lake—compare BRANCH b: a vein that empties into a larger vein". Webster's Third New International Dictionary, p. 2441 (3rd ed. 1976). Applying the common definition of the word, Gum Bayou is a tributary of the West Pearl River. In *Buttrey I*, it was characterized as a "small, slow running stream". 690 F.2d at 1172. The Corps's jurisdictional findings state that Gum Bayou drains into the West Pearl River. (Findings, p. 5). The average annual stream flow of Gum Bayou in the vicinity of the sewage treatment plant is seven cubic feet per second. (Buttrey Exh. 8, 7th–10th pp.). This flow is greater than the cut-off flow for the headwaters of a stream, making

Gum Bayou at the plant site a "primary tributary" under the regulatory definition.

The Corps attempts to confine the definition of "primary tributary" to "non-wetland streams", in its Findings, using the definition which appeared in the 1975 regulations. (Findings, p. 5).[4] That definition is identical to the current, previously quoted definition, and neither indicates that a stream cannot run through a wetland area. The Corps itself consistently identified Gum Bayou as a tributary of the West Pearl River when it was considering Buttrey's proposal to channelize a portion of it. (*See*, Buttrey Exh. 17 and Plaintiffs' Motion for Judicial Review of the Corps of Engineers' Jurisdictional Determination, R. Doc. 30, Attachments 1, 2, 3). The administrative record in that case indicates that the bayou was also considered a tributary by the U.S. Fish and Wildlife Service, Environmental Protection Agency, and National Marine Fisheries Service. (*See*, R. 80–1617, the Administrative Record, separately filed, Attachments No. 11b, 15c, 15d). Although in the instant proceeding the Corps has not characterized Gum Bayou as a tributary, it has referred to the fill material for the sewage treatment plant as located in "wetlands adjacent to Gum Bayou", rather than wetlands adjacent to the West Pearl River (*See*, R., Doc. 10, Addendum B). The Corps's jurisdictional determination also makes reference to Buttrey Exhibit 5, a letter from the Chief of the Corps's Regulatory Functions Branch regarding another proposed project located "above the headwaters of Gum Bayou". (*See*, Findings, p. 5; Buttrey Exh. 5). The term "headwaters", given its definition in the regulations, has no application to a wetland, as the Corps itself has previously noted. (*See*, R. 80–1617, Doc. 8, p. 30; 40 Fed.Reg. 31,322 (1975)).

The Corps's second argument is that Gum Bayou meets the definition of a wetland because its lower 6,000 feet are subject to periods of inundation from the backwaters of the river during winter and spring flooding, and because its soil and

---

**4.** *See,* discussion of applicability of 1975 regulations *infra,* at page 290.

vegetation are characteristic of wetlands. The Corps's Findings relative to backwater rely on data concerning the daily river levels of the West Pearl River near the town of Pearl River, which approximates river mile 20.5 (*See,* Corp. Exhs. 4, 7) to show that Gum Bayou is inundated by periodic flooding of the West Pearl River. The conclusions concerning the backup of water into the bayou are based on measurements of the river elevation at mile 14.5 of the river for the two year flood event, and measurements of the invert elevation of the bayou in the vicinity of the sewage treatment plant (*See,* Findings, p. 6; Corps Exhs. 8, 9). As Buttrey has noted, the calculations concerning the invert elevation of the bayou are not supported by the record, and the bayou and the river converge at mile 14 rather than mile 14.5, making the Corps's findings on this point if not unsupportable then certainly lacking the factual predicate necessary to support a finding of jurisdiction. (*See,* Buttrey Exh. 13g; Corps Exh. 4; Findings, p. 4). In response, the Corps asserts that the flood wave of the river at mile 14.5 extends *laterally* over the river and backs water up over Gum Bayou to the height of the flood wave. (R., Doc. 33, p. 11 and n. 13). This, however, is not what the Corps's findings state; those findings speak clearly and solely in terms of backwater—not lateral flooding. They also explicitly limit them to two year flood events, as opposed to normal river stages:

> The 2-year flood event would result in a water elevation of 7.8 feet NGVD [5] at river mile 14.5. This water elevation on the river would back up water in Gum Bayou to 7.8 feet NGVD without any surface water runoff coming down Gum Bayou. The mean annual flood event would raise water elevation in Gum Bayou and inundate the swamp to elevation

7.8 feet at the mouth and back water up Gum Bayou.

(Findings, p. 6).

The Corps's data show the elevation of the river at the two-year flood event to be 7.4 feet NGVD at river mile 14. Evidence in the record indicates that measurements of the depth of the bayou at the site of the sewage treatment plant vary from 7.1 feet to 9.9 feet. (*See,* Corps Exh. 9; Buttrey Exhs. 6, 7). A profile prepared by the Louisiana Department of Public Works of the thalweg of Gum Bayou shows its elevation to be eight feet at the site of the treatment plant and to exceed 7.4 feet (and even 7.8 feet) at several points below the plant. (Buttrey Exh. 6). The Corps does not attempt to explain these data; on their face they indicate that a 7.4 foot "event" would have difficulty traversing elevations ranging from 7.4 to 8.0 feet, to create sustained backwater conditions. Further, its probative value in distinguishing a tributary from a wetland is questionable, given that flooding rivers can also back up tributaries or overflow them laterally. The Court is equally unpersuaded by the Corps's statement that its prior characterization of Gum Bayou as a tributary in *Buttrey I* was "adequate for the purposes intended at that time, to serve merely as a frame of reference for location", because distinctions between the phases of its jurisdiction were not then necessary. (Findings, p. 5). Without deciding whether or not the Corps is attempting to have the best of both worlds, depending on its posture at a given time, the Court finds that the determination that the bayou is a wetland rather than a primary tributary was arbitrary and capricious, and not supported by the record.

The Corps also argues that under the regulations in effect in 1975, the phased-in schedule of the Corps's jurisdiction was only applicable to activities for which prior state water quality certification has been

---

**5.** The Corps benchmarks use the National Geodetic Vertical Datum (hereinafter NGVD) measure of elevation instead of mean sea level. The difference in measures results in NGVD elevations being .36 feet higher than mean sea level

elevations. (*See,* Memorandum in Support of Plaintiff's Motion for Judicial Review of the Corps of Engineers Jurisdictional Determination, hereinafter "Attachment"; R., Doc. 30, at p. 8; Corps Exh. 7).

obtained. Therefore, the Corps urges, since Buttrey had not obtained state water quality certification before placing the fill, he was not exempt from the permit requirement, regardless of the characterization of Gum Bayou. Buttrey argues that the requirement for state water quality certification was deleted in the 1977 amendments to the regulations and the Court must apply the current law in determining Corps's jurisdiction.[6] He also asserts that Louisiana did not have in effect a requirement of state water quality certification in 1975, although it did provide for such certification when required of applicants for federal permits.

■ A court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary. *LTV Federal Credit Union v. UMIC Government Securities, Inc.*, 704 F.2d 199, 201 (5th Cir.1983), quoting *Bradley v. Richmond School Board*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). The 1975 regulations were merely interim regulations, finalized and clarified by the 1977 amendments. *See*, 42 Fed.Reg. 37,125 (1977). This is not a routine lawsuit between purely private parties where retroactive application might work an injustice on the parties. *See, LTV* at 203–04; *Bradley*, 416 U.S. at 716–19, 94 S.Ct. at 2018–20. The 1977 regulations had been in effect for three years when the Corps acted, and it fashioned the regulations. "An agency is bound to apply the law in effect at the time of its decision". *Deltona Corp. v. Alexander*, 504 F.Supp. 1280, 1285 (M.D.Fla.1981), *aff'd* 682 F.2d 888 (11th Cir.1982). The current regulations are therefore applicable.

As amended in 1977, the regulations do not require state water quality certification as a prerequisite to the phasing-in schedule's application. The official comments accompanying the 1977 amendments state that the conditions under which discharges are authorized prior to the phasing-in dates "remain the same as were published in 1975", 42 Fed.Reg. 37,131 (1977), and that those discharges are permitted subject to six specified conditions, 42 Fed.Reg. 37,124 (1977), but the published regulation only includes four conditions:

§ 323.4 Discharges permitted by this regulation.

(a) *General.* Discharges of dredged or fill material specified in §§ 323.4–1, 323.4–2 and 323.4–3, below are hereby permitted for purposes of Section 404 without further processing under this regulation (individual applications are not needed), except as provided in § 323.4–4 below. Permits may, however, be required under Section 10 of the River and Harbor Act of 1899 (see 33 CFR Part 322). Sections 323.4–1, 323.4–2, and 323.-4–3 do not obviate the requirement to obtain State or local assent required by law for the activities permitted therein.

33 C.F.R. § 323.4(a) (1982).

§ 323.4–1 Discharges prior to effective dates of phasing.

(a) Discharges of dredged or fill material in waters of the United States that occur before the phase-in dates specified in § 323.3(a)(2) through (4) of this part are hereby permitted for purposes of Section 404, provided the conditions in paragraph (c) of this section, are met.

(b) Discharges of dredged or fill material of less than 500 cubic yards into waters other than navigable waters of the United States (see 33 CFR Part 329) that are part of an activity that was commenced before July 25, 1975, that were completed by January 25, 1975, and that involve a single and complete project and not a number of projects associated with a complete development plan are hereby permitted for purposes of Section 404, provided the conditions in paragraph (c) of this section, are met. The term "commenced" as used herein shall be satisfied if there has been, before July

---

**6.** The regulations were further amended in July, 1982, but those amendments are not relevant to the issues at hand. *See*, 47 Fed.Reg. 31,794 (1982). The current regulations are the same as the regulations in effect in 1980 when the Corps issued the cease and desist order.

25, 1975, some discharge of dredged or fill material as a part of the above activity or an entering into of a written contractual obligation to have the dredged or fill material discharged at a designated disposal site by a contractor.

(c) For the purposes of Section 404, the following conditions must have been satisfied for the discharges occurring before the dates specified in paragraphs (a) and (b) of this section:

(1) That the discharge was not located in the proximity of a public water intake;

(2) That the discharge did not contain unacceptable levels of pathogenic organisms in areas used for recreation involving physical contact with the water;

(3) That the discharge did not occur in areas of concentrated shellfish production; and

(4) That the discharge did not destroy or endanger the critical habitat or a threatened or endangered species, as identified under the endangered species act.

33 C.F.R. § 323.4–1 (1982).

Although Section 323.4 requires state or local assent where it is "required by law", neither federal nor Louisiana law required such certification in this instance. Applicable federal law requires that state certification be obtained by "[a]ny applicant for a federal license or permit ..." 33 U.S.C. § 1341. Louisiana law in effect at the time merely provided for certifications "... which applicants for federal licenses or permits are required to provide to the appropriate federal agency under Section 21 of the Federal Water Pollution Control Act ..." Act No. 712, § 1, 1975 La.Sess.Law Serv. 1526 (West) (current version at La. Rev.Stat.Ann. § 30:1094(A)(3) (West Supp. 1983). Buttrey was never an applicant for a federal permit to place the fill. The plain language of the regulation does not impose any independent duty to obtain such certification on a non-applicant in order for the phased-in exemptions to apply.

The Corps asserts that such a requirement is currently contained elsewhere in the regulations, specifically at §§ 320.4(d)

and 325.2(b). The first of those sections states:

(d) *Water quality.* Applications for permits for activities which may affect the quality of a water of the United States will be evaluated for compliance with applicable effluent limitations, water quality standards, and management practices during the construction, operation, and maintenance of the proposed activity. Certification of compliance with applicable effluent limitations and water quality standards required under provisions of Section 401 of the Federal Water Pollution Control Act will be considered conclusive with respect to water quality considerations unless the Regional Administrator, Environmental Protection Agency (EPA), advises of other water quality aspects to be taken into consideration. Any permit issued may be conditioned to implement water quality protection measures.

33 C.F.R. § 320.4(d) (1982). Since Buttrey has not applied for a permit, that section is inapplicable. Nor is the second section pertinent, as it simply outlines procedures for obtaining certification when it is required:

(b) *Procedures for particular types of permit situations.* (1) If the District Engineer determines that water quality certification for the proposed activity is necessary under the provisions of the Federal Water Pollution Control Act, he shall so notify the applicant and obtain from him either the appropriate certification or a copy of his application for such certification. The District Engineer may issue the public notice of the application jointly with the certifying agency if arrangements for such joint notices have been approved by the Division Engineer. When the activity may affect the waters of another State, a copy of the certification will be forwarded to the Regional Administrator of EPA who shall determine if the proposed activity may affect the quality of the waters of any State or States other than the State in which the work is to be performed. If he needs supplemental information in order to

make this determination, the Regional Administrator may request it from the District Engineer who shall obtain it from the applicant and forward it to the Regional Administrator. The Regional Administrator shall, within thirty days of receipt of the application, certification and supplemental information, notify the affected State, the District Engineer, and the applicant in the event such a second State may be affected. The second State then has sixty days to advise the District Engineer that it objects to the issuance of the permit on the basis of the effect on the quality of its waters and to request a hearing. No authorization will be granted until required certification has been obtained or has been waived. Waiver is deemed to occur if the certifying agency fails or refuses to act on a request for certification within a reasonable period of time after receipt of such request. The request for certification must be made in accordance with the regulations of the certifying agency . . . .

33 C.F.R. § 325.2(b) (1982).

 When an agency's construction of its own administrative regulations is at issue, the Court must determine whether the agency's reading of the regulation is reasonable and consistent over time. The agency's interpretation is of controlling weight unless it is plainly erroneous or inconsistent with the regulation. *PPG Industries, Inc. v. Harrison,* 660 F.2d 628, 633 (5th Cir.1981), citing *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616 (1965). Where the agency interpretation is reasonable, it must stand even though it may not appear as reasonable as some other. *Homan & Crimen, Inc. v. Harris,* 626 F.2d 1201, 1208–09 (5th Cir.1980), *petition for cert. refused,* 450 U.S. 975, 101 S.Ct. 1506, 67 L.Ed.2d 809 (1981). Here the agency's interpretation is not reasonable or consistent with the language in the regulations:

§ 323.3 Discharges requiring permits.

(a) *General.* Department of the Army permits will be required for the discharge of dredged or fill material into waters of the United States. Certain discharges specified in §§ 323.4–1, 323.-4–2 and 323.4–3 are permitted by this regulation. If a discharge of dredged or fill material is *not* permitted by this regulation, an individual or general Section 404 permit will be required for the discharge of dredged or fill material into waters of the United States in accordance with the following phased schedule . . . .

33 C.F.R. § 323.3(a) (1982) (emphasis added). The requirement of state water quality certification is not contained in the current regulations as a prerequisite to phasing in of the Corps's jurisdiction.

Nor do the regulations in effect when the fill was placed require Buttrey to obtain state water quality certification.

(2) *Discharges of dredged material or of fill material into navigable waters.* (i) Except as provided in subparagraphs (ii) and (iii) below, Department of the Army permits will be required for the discharge of dredged material or of fill material into navigable waters in accordance with the following phased schedule:

(a) *Phase I:* After the effective date of this regulation, discharge of dredged material or of fill material into coastal waters and coastal wetlands contiguous or adjacent thereto or into inland navigable waters of the United States and freshwater wetlands contiguous or adjacent thereto are subject to the procedures of this regulation.

(b) *Phase II:* After July 1, 1976, discharges of dredged material or of fill material into primary tributaries, freshwater wetlands contiguous or adjacent to primary tributaries, and lakes are subject to the procedures of this regulation.

(c) *Phase III:* After July 1, 1977, discharges of dredged material or of fill material into any navigable water are subject to the procedures of this regulation.

(ii) All other discharges of dredged or fill material that occur before the dates specified in subparagraphs (i) (b) and (c) above, are hereby permitted for purposes

of Section 404 of the Federal Water Pollution Control Act without further processing under this regulation; *provided however,* That the procedures of this regulation including those pertaining to individual and general permits (see paragraph (i)(2)(ix), below) shall apply to any discharge(s) of dredged or fill material if the District Engineer determines that the water quality concerns as expressed in the guidelines (see 40 CFR 230) indicate the need for such action; and *further provided,* That the following conditions are met:

(a) That a water-quality certification under section 401 of the Federal Water Pollution Control Act (see paragraph (c)(1) of this section) is obtained before the discharge is commenced or the State has waived its right to so certify;

33 C.F.R. § 209.120(e)(2)(ii)(a) (1976).

■ Paragraph (c)(1), referred to in that section, states:

(c) *Related legislation.* (1) Section 402 of the Federal Water Pollution Control Act (PL 92–500; 86 Stat. 816, 33 U.S. 1411) requires any applicant for a Federal license or permit to conduct any activity which may result in a discharge into navigable waters to obtain a certification from the State in which the discharge originates or will originate, or, if appropriate, from the interstate water pollution control agency having jurisdiction over the navigable waters at the point where the discharge originates or will originate, that the discharge will comply with the applicable effluent limitations and water quality standards. A certification obtained for the construction of any facility must also pertain to the subsequent operation of the facility.

33 C.F.R. § 209.120(c)(1). This requirement is inapplicable to Buttrey because, (1) he was not an applicant for a federal permit, and (2) there were no applicable effluent limitations or water quality standards for him to comply with if the Corps did not have jurisdiction over the plant site under Phase II. Rather than a condition for the application of the phasing-in of jur-

isdiction, part ii of the regulation is a grandfather clause that applies to "all *other* discharges" (emphasis added). This interpretation is buttressed by the language "except as provided in subparagraphs (ii) and (iii) below ..." in part (i) of that section. Therefore, even if the 1975 regulations were applicable, state water quality certification would not be required for Buttrey to be exempt from Corps jurisdiction under Phase II. The Corps did not have jurisdiction over the site of the sewage treatment plant under the law in effect when it issued the cease and desist order, and its attempt to exert jurisdiction under the 1975 regulations was arbitrary and capricious.

## II—THE POND

On November 21, 1980 the Corps issued the following cease and desist order directed to Buttrey (certain portions of the order regarding the construction of a levee, not the subject of this litigation, have been deleted):

The work that you have performed in connection with the construction of a levee and the dredging in the adjacent wetlands of the Morgan River in Magnolia Forest Subdivision in Section 19, T. 8 S., R. 15 E., Slidell, St. Tammany Parish, Louisiana, is regulated by the Federal permitting authority of this office.

Initiating the work without first obtaining a permit is in violation of Section 10 of the River and Harbor Act of 1899 (33 USC 403) and Section 404 of the Clean Water Act of 1977 (33 USC 1344) .... Specifically a levee has been constructed in a slough of the Morgan River and fill dirt has been dredged out of this slough to construct the levee ....

In our letter dated 22 October 1980 to you concerning your proposed excavation of a lake, we suggested that you apply for a permit since dredging operations normally result in discharges and these discharges are regulated under Section 404. Additionally, the dredging of these adjacent wetlands of the Morgan River are regulated under Section 10 of the River and Harbor Act of 1899. Section

10 was not addressed in our 22 October 1980 letter. This omission was an oversight by staff elements and brought to your attention by our field personnel. You are hereby directed to cease and desist all activities of this nature immediately and to notify this office in writing within 10 days of receipt of this letter as to why the work was commenced without a permit.

(R., Doc. 9, Exh. B). The object of the order is a pond on the eastern edge of the subdivision, which Buttrey had begun excavating pursuant to a representation by the Corps's Mobile District Engineer that no permit would be required for the work as long as the excavated materials were removed from the site (*See* R, Doc. 9, Exh. E). The pond is located in a slough of the Morgan River, which in turn flows into the West Pearl River at river mile seventeen (*See*, Corps Exh. 4; Buttrey Exh. 13g). The pond is approximately one mile from the West Pearl River in a straight line, and its location corresponds to river mile 17.9 of the West Pearl River (Corps Exh. 4; Buttrey Exh. 4). The pond is approximately 1000 feet from the Morgan River (Buttrey Exhs. 4, 13g).

The Corps is asserting jurisdiction over the pond site under section 10 of the Rivers and Harbors Act, which provides in relevant part:

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; ... and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

33 U.S.C. § 403. The Corps's jurisdiction under the Rivers and Harbors Act, as op-

posed to the Clean Water Act, remains confined to the traditional concept of navigable waters:

The terms "navigable waters of the United States" and "waters of the United States" are frequently used throughout these regulations, and it is important that the reader understand the difference from the outset. "Navigable waters of the United States" are defined in 33 CFR Part 329. These are the traditional waters where permits are required for work or structures pursuant to sections 9 and 10 of the River and Harbor Act of 1899. "Waters of the United States" are defined in 33 CFR 323.2(a). These waters are the waters where permits are required for the discharge of dredged or fill material pursuant to section 404 of the Federal Water Pollution Control Act Amendments of 1972.

33 C.F.R. § 320.1(c) (1982).

It is undisputed that the West Pearl River is a navigable body of water. However, the Corps claims, and Buttrey disputes, that the Morgan River and the slough are also "navigable waters." In the alternative, the Corps asserts that the pond is within the banks of the West Pearl River because its elevation is below the ordinary high water mark (OHWM) of the river.

*A—Navigability of the Slough*

The Corps recognizes that defining navigability is a judicial rather than an administrative function.

Precise definitions of "navigable waters" or "navigability" are ultimately dependent on judicial interpretation, and cannot be made conclusively by administrative agencies. However, the policies and criteria contained in this regulation are in close conformance with the tests used by the Federal Courts and determinations made under this regulation are considered binding in regard to the activities of the Corps of Engineers.

33 C.F.R. § 329.3 (1982).

The judicial concept of navigability is summarized in *Miami Valley Conservancy District v. Alexander*, 692 F.2d 447 (6th

Cir.1980), *cert. denied*, —— U.S. ——, 103 S.Ct. 3096, 77 L.Ed.2d 1355 (1983):

The earliest and most frequently cited definition of navigability appeared in *The Daniel Ball v. United States*, 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1871). The Supreme Court held:

Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are *used, or are susceptible of being used*, in their ordinary condition, as *highways for commerce*, over which trade and travel are or may be conducted in the *customary modes of trade and travel* on water. (emphasis added).

Subsequent cases have refined the definition of navigability. A river is navigable if it can be made useful through reasonable improvements. *United States v. Appalachian Electric Power Co.*, 311 U.S. 377, 409, 61 S.Ct. 291, 300, 85 L.Ed. 243 (1940). The use of navigable streams may be limited to travel during seasonal water level fluctuations. *Economy Light and Power Co. v. United States*, 256 U.S. 113, 122, 41 S.Ct. 409, 412, 65 L.Ed. 847 (1921). Moreover, a river is still navigable despite "occasional natural obstructions or portages ...." *Id.* However, where commercial use or susceptibility of use is "sporadic and ineffective," the river is not navigable. *United States v. State of Oregon*, 295 U.S. 1, 23, 55 S.Ct. 610, 619, 79 L.Ed. 1267 (1935). A waterway is not navigable when "its use for any purposes of transportation has been and is exceptional, and only in times of temporary high water." *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 699, 19 S.Ct. 770, 773, 43 L.Ed. 1136 (1899).

The Supreme Court has emphasized repeatedly that a navigable waterway of the United States must be "of practical service as a highway of commerce". *Economy Light*, 256 U.S. at 124, 41 S.Ct. at 413. A navigable river is one of "general and common usefulness for purposes of trade and commerce." *Oregon*, 295 U.S. at 23, 55 S.Ct. at 619. The

Rivers and Harbors Act protects "the Nation's right that its waterways be utilized for the interests of the commerce of the whole country." *Appalachian Electric*, 311 U.S. at 405, 61 S.Ct. at 298.

When it is remembered that the source of the power of the general government to act at all in this matter arises out of its power to regulate commerce with foreign countries and among the states, it is obvious that what the Constitution and acts of Congress have in view is *the promotion and protection of commerce in its international and interstate aspect*, and a practical construction must be put on these enactments as intended for such large and important purposes. *Leovy v. United States*, 177 U.S. 621, 633, 20 S.Ct. 797, 801, 44 L.Ed. 914 (1900) (emphasis added).

Under the historical use test of navigability a river is "indelibly navigable." *State of Oklahoma ex rel. Phillips v. Guy F. Atkins*, 313 U.S. 508, 61 S.Ct. 1050, 85 L.Ed. 1487 (1941). That is, a river is navigable as a matter of law if it has ever been navigable. For a river to be considered a navigable water of the United States, it is sufficient that the river has been used as a commercial highway even though it no longer is or can be used as such.

692 F.2d at 449–50. The Corps's definition of navigability generally tracks the judicial definition:

§ 329.4 General definition.

Navigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce: A determination of navigability, once made, applies laterally over the entire surface of the waterbody, and is not extinguished by later actions or events which impede or destroy navigable capacity.

§ 329.5 General scope of determinations.

The several factors which must be examined when making a determination

whether a waterbody is a navigable water of the United States are discussed in detail below. Generally, the following conditions must be satisfied:

(a) Past, present, or potential presence of interstate or foreign commerce;

(b) Physical capabilities for use by commerce as in paragraph (a) of this section; and

(c) Defined geographic limits of the waterbody.

33 C.F.R. §§ 329.4, 329.5 (1982).

The Corps claims navigability in fact of the Morgan River because Buttrey transported two Corps representatives from the Magnolia Forest Subdivision through an adjacent inundated slough to the channel of the Morgan River and down that river almost to its confluence with the West Pearl River on November 25, 1980. (*See,* Findings, p. 12 and Corps Exh. 15) The slough traversed was not the slough involved in this suit. (*Id.*) While this fact might support a conclusion that the Morgan River can be made navigable through reasonable improvements, nothing in the administrative record suggests more than sporadic navigability of the slough. On March 12, 1982, a Corps inspector traveled by canoe from the pond site to the open river channel in order to sample the overstory in the slough. At the centers of the two plots sampled, one one-third and the other two-thirds of the distance from the bank of the slough, the water depth was approximately six feet. (*See,* Findings, p. 13; Corps Exh. 16). However, Corps photographs of the slough taken during July, 1981 and November, 1980 show the slough to be completely dry and grassy in places and to contain only small amounts of standing water (Corps Exhs. 10, 12). The photographs in Corps Exhibit 10 were taken only days before the November 25, 1980 boat trip in the "adjacent inundated forested slough", suggesting either that the slough in question does not share the navigable properties of the other slough, or that the navigability of the adjacent slough was created by a subsequent rain.

■ The implausibility of making the slough navigable by reasonable improvements is also indicated by Corps Exhibit 3c, an aerial photograph of the West Pearl River, Morgan River, slough and pond site. Buttrey Exhibit 11, an enlargement of the upper center portion of that photograph, pinpoints the location of the slough and pond. Corps Exhibit 3b, also an enlargement of Exhibit 3c, purports to show the slough's convergence with the Morgan River. None of these photographs depict a potentially navigable waterway. While seasonal utility may suffice to confer navigability on a body of water, sporadic use does not. "Nor is the lack of commercial traffic a bar to a conclusion of navigability where personal or private use by boats demonstrates the availability of the stream for the simpler types of commercial navigation". *Weiszmann v. District Engineer, U.S. Army Corps. of Engineers,* 526 F.2d 1302, 1305 (5th Cir.1976), citing *Appalachian Power,* 311 U.S. at 416, 61 S.Ct. at 303. However, there is no indication in the record that the slough is either used or susceptible to use by such craft, and it is not suggested that it was ever navigable in the past.

■ The Corps's determination that the slough is navigable in fact is arbitrary and capricious and unsupported by the administrative record. *See, Miami Valley; Cf., United States v. Ross,* 74 F.Supp. 6 (E.D. Mo.1947) (United States had no jurisdiction over criminal offense occurring in borrow pit along Mississippi River); compare *Weiszmann* (excavated canals fifty feet wide and fourteen feet deep determined to be navigable). The Corps cites *United States v. De Felice,* 641 F.2d 1169, 1175 n. 16 (5th Cir.), *cert. denied,* 454 U.S. 940, 102 S.Ct. 474, 70 L.Ed.2d 247 (1981), for the proposition that connection with a continuous interstate waterway is an alternative definition of navigability (R., Doc. 33, p. 20 n. 18). However, *De Felice* is merely referring to the Supreme Court's caveat that the concept of navigability has different meanings when used in different contexts. *Kaiser Aetna v. United States,* 444 U.S. 164, 170–72, 100 S.Ct. 383, 387–89, 62 L.Ed.2d

332 (1979). Neither case establishes a new definition of navigability. The Corps's confusion may stem from its reliance on cases dealing with coastal waters, where a different standard applies. *See*, 33 C.F.R. § 329.12 (1982); *De Felice*, 641 F.2d at 1174–75.

Nor has the Corps been consistent in its characterization of the stream as navigable. On October 22, 1980, the Corps's district engineer wrote to Buttrey about the proposed excavation, stating that no permit would be required for the work, and on January 11, 1978, the chief of the Corps's regulatory functions branch wrote that a proposed crossing of the slough was already authorized under the nationwide permit program because the slough had less than five cubic feet per second flow and was not subject to tidal action or ordinary high waters of other streams. (Buttrey Exhs. 15(2) and 15(7)). Furthermore, the cease and desist order referred to the slough as wetland adjacent to the Morgan River. (R., Doc. 9, Exh. B). The Corps's subsequent determination that the slough is a navigable water of the United States is arbitrary and capricious.

### B—*The Slough: Within the West Pearl Riverbed?*

Also arbitrary is the Corps's determination that the slough and therefore the pond are below the OHWM of the West Pearl River, making them subject to Corps jurisdiction by virtue of its jurisdiction over that river. Here also, the distinction between tidal and non-tidal waters is relevant. The regulations delineate the Corps's jurisdiction over non-tidal rivers and lakes to reflect the traditional judicial concept of the bed of a river:

§ 329.11 Geographic and jurisdictional limits or rivers and lakes.

(a) *Jurisdiction over entire bed.* Federal regulatory jurisdiction, and powers of improvement for navigation, extend laterally to the entire water surface and bed of a navigable waterbody, which includes all the land and waters below the ordinary high water mark.

(1) The "ordinary high water mark" on non-tidal rivers is the line on the shore established by the fluctuations of water and indicated by physical characteristics such as a clear, natural line impressed on the bank; shelving; changes in the character of soil; destruction of terrestrial vegetation; the presence of litter and debris; or other appropriate means that consider the characteristics of the surrounding areas.

33 C.F.R. § 329.11 (1982). The various expressions of that concept were listed in *United States v. Cameron*, 466 F.Supp. 1099 (M.D.Fla.1978):

The ordinary high water line has, for example, been defined as the line where the water stands sufficiently long to destroy vegetation below it. *Goose Creek Hunting Club, Inc. v. United States*, 518 F.2d 579, 583, 207 Ct.Cl. 323 (1975); *Kelley's Creek and Northwestern R.R. v. United States*, 100 Ct.Cl. 396, 406 (1943).

It has also been said to be the line which diverts [sic] upland from the river bed, the river bed being the "land upon which the action of the water has been so constant as to destroy vegetation." *United States v. Chicago B & Q R. Co.*, 90 F.2d 161, 170 (7th Cir.1937). Another Court has defined the mark as "a natural physical characteristic placed upon the lands by the action of the river." *U.S. v. Claridge*, 279 F.Supp. 87 (D.Ariz.1966); *aff'd.* 416 F.2d 933, *cert. denied* 397 U.S. 961, 90 S.Ct. 994, 25 L.Ed.2d 253 (1969). The Court in *Harrison v. Fite*, 148 F. 781 (8th Cir.1906) defined the ordinary high water line as the line below which the soil is so usually covered by water that it is wrested from vegetation and its value for agricultural purposes destroyed. The Third Circuit similarly defined the term as the line below which the waters have so visibly asserted their dominion that terrestrial plant life ceases to grow and, therefore, the value for agricultural purposes is destroyed. *See Borough of Ford City v. United States*, 345 F.2d 645, 648 (3rd Cir.1965), *cert. denied*, 382 U.S. 902, 86 S.Ct. 236, 15 L.Ed.2d 156.

**298**

One can find in the reports numerous other definitions of the term, most varying in some way from the others and designed to provide a working definition for the facts in the particular case. In short, the courts have tended to define the term to fit the method of proof employed: vegetation analysis, physical inspection, etc., *See Goose Creek Hunting Club, Inc. v. United States, supra* at 583.

466 F.Supp. at 1111.

■ The Corps's definition of OHWM has been cited with approval in *Kaiser v. Aetna*, 444 U.S. at 171, n. 6, 100 S.Ct. at 388, n. 6. The Courts have made clear, however, that a river's OHWM does not encompass its peak flow or flood stages. *Oklahoma v. Texas*, 260 U.S. 606, 43 S.Ct. 221, 67 L.Ed. 428 (1923); *United States v. Claridge*, 279 F.Supp. 87, 91 (D.C.Ariz. 1967), *aff'd*, 416 F.2d 933 (9th Cir.1969), *cert. denied*, 397 U.S. 961, 90 S.Ct. 994, 25 L.Ed.2d 253 (1970); *see also, Cameron; Goose Creek Hunting Club, Inc. v. United States*, 518 F.2d 579 (Ct.Cl.1975). This restriction was explicitly stated in a prior version of the regulations, *see*, 33 C.F.R. § 209.260(j)(i) (1977), but has since been deleted.

In contrast, the Corps's jurisdiction over oceanic and tidal waters extends to all waters below the mean high tide line, and includes the surface of all water bodies subject to tidal action, even though they may be shallow marshlands. 33 C.F.R. § 329.12(a)(2) and (b) (1982). It is clear that jurisdiction over wetlands adjacent to non-tidal rivers was not contemplated under the Rivers and Harbors Act. The Corps's reliance on *United States v. Weisman*, 489 F.Supp. 1331 (M.D.Fla.), *aff'd*, 632 F.2d 891 (5th Cir.1980) (mem.), is therefore misplaced, as that case involved a tidal body of water.

Given the commonly understood definition of OHWM embodied in the Corps's regulations, the determination that the water of the West Pearl River extends laterally over the surface of the pond site is ludicrous. Initially, it is apparent that the Corps has included water levels at flood stage in determining the OHWM. The Corps's graph of water surface elevations along the West Pearl River during the highest floods that occur during every year indicates that the Mean Annual Flood level at river mile 17.9 is ten feet. The Corps explains this measure as the height that half the flood peaks in a given year are statistically likely to exceed (Corps Exh. 8). The Corps has also determined that the height of the OHWM at river mile 17.9 is ten feet. (*See*, Findings, p. 10).

A plot of the water surface elevations against the river miles prepared by the Corps indicates that the OHWM at the Corps's gauge at Pearl River, Louisiana, located at river mile 22.2, would be fourteen feet. (*See*, Buttrey Exh. 13b). This elevation is two feet above the flood stage for that point of the river, as determined by the National Weather Service. (*See*, Corps Exh. 7). The Corps dismisses this information by saying:

> The floodstage of 12 feet at the Pearl River gage at Pearl River has been arbitrarily set by the National Weather Service and does not correspond to frequency of flooding (i.e. 2-year, 5-year, 50-year, or 100-year flood) as established by the Corps of Engineers.
>
> In an area where the river is at or above the National Weather Service's floodstage elevation of 12 feet for over 3 months a year, ordinary high water mark elevations higher than the National Weather Service's floodstage are not unreasonable.

(Findings, p. 15). The Corps then cites figures calculated from U.S. Geological Survey data for the years 1975 to 1980 (Corps Exh. 7) to show that the ten foot water elevation at the Pearl River gauge was exceeded an average of 141 days per year, and the fourteen foot elevation obtained from Buttrey's graph was exceeded an average of 58 days per year (Findings, p. 15). This data is not determinative, since: (1) there is no dispute that the water levels are lower at river mile 17.9, the relevant location; (2) the fact that a level

was exceeded for slightly less than 16 percent of the time is not indicative that it is the OHWM, particularly when flood levels were included in the calculation; and, (3) Buttrey's computations for the same location using data over a 43 year period produce lower figures (see, Attachment, p. 6; Buttrey Exhs. 13b, 14b, 14c).

The Corps's jurisdictional findings state that the differences in elevation measurements taken by Buttrey and the Corps are due to discrepancies between the two Government benchmark systems (the U.S. E.D. benchmark system produced elevations .99 feet higher than the new Corps of Engineers TBM system) of which Buttrey was unaware. (Findings, p. 14). This assertion is curious, as Buttrey had apprised the Corps of inaccuracies in the benchmark system as early as 1981, and his engineer noted a 1.1 foot discrepancy in elevation between the benchmarks near the pond site during the April 27, 1982 readings. (See, R., Doc. 30, Attachment 6; Buttrey Exh. 12a). The determination is also unreasonable in light of other data in the record. The Corps states that the pond should contain eleven feet of water when the West Pearl River is at its OHWM (R., Doc. 33, p. 25). However, on March 8, 1982, the Corps measured the water surface elevation at the pond at only 8.29 feet NGVD, although March is one of the months of high water elevation. (See, Corps Exhs. 6, 7; Buttrey Exh. 18). At that time, the Corps measured the water elevation in the West Pearl River at river mile 16.7 at only 7.69 feet NGVD (Corps Exh. 6). On April 27, 1982, the West Pearl River was at 13.7 feet NGVD, well above its flood stage, and the elevation at the pond was only 9.80 mean sea level (Buttrey Exh. 12). A comparison of the Corps's photographs of the same view of the pond taken from the adjacent levee is possible, and shows that, even at the highest water elevation photographed, the top of a tree stump no more than two feet high is visible in the slough. (See, Corps Exhs. 10 on 1st page, 11 on 1st page, and 6 on 2nd page of photographs).

During months of lower water elevations, the site contains almost no water.

(See, Corps Exhs. 10, 12). The unexcavated portions of the slough are even more shallow than the pond, containing an average of 4.3 feet of water on March 8, 1982 (see, Corps Exh. 6, field notes; R., Doc. 33, p. 25), between five and seven feet on March 12, 1982 (see, Corps Exh. 16), very little water on July 14, 1981 (Corps Exh. 12) and no water on November 12, 1980 (Corps Exh. 10). Even on July 14, 1981, the photograph of the pond site shows that it was separated from the rest of the slough by dry, grass-covered ground (Corps Exh. 12). It is difficult to conceive of the pond as being within the banks of the West Pearl River, when they are separated by dry ground for portions of the year, even at their direct water connection.

The result obtained may well be due to the Corps's method of measurement. The pond is located at the end of Burnside Drive in the Magnolia Forest subdivision. It is at the end of the slough, and bordered on the other end by a levee constructed by Buttrey. (See, Corps Exh. 13, attachment 2, and Exh. 6, area map). To determine the OHWM of the West Pearl River at river mile 17.9, the Corps measured the river's actual water level at river mile 16.7 (but not its OHWM), and the actual water levels and OHWM's of the slough in question, and a second slough where Buttrey was constructing a fish pond, located at a 90 degree bend in Morgan Bluff Road in the subdivision. This mixture of measurements can hardly be distilled into a definite factual determination.

Further, although the regulations call for several alternative methods of determining OHWM, including the presence of a clear, natural line on the bank, shelving, destruction of terrestrial vegetation, changes in the character of the soil, or the presence of litter and debris, and the Corps purports to have used such measures (see, Findings, p. 14), the only measurements documented were of the elevations at which the bark on the trees in the slough became stained (Corps Exh. 6). Although measurements of the OHWM on the ground were also made during the survey, there is no expla-

nation of how they were determined, and only one photograph at the other slough depicts that measurement being taken. It is impossible to tell from the photograph what criteria were used, as there are no apparent changes in the debris or the soil. If the presence of living grass was the criterion used, the entire slough is covered with grass during parts of the year and that criterion would be variable at best. However, it is evident from photographs that the OHWM · as measured for that slough is also much higher than its actual water elevations, and encompasses ground covered with grass. (*See,* Corps Exhs. 14 and 6, 1st page of photographs). The Corps then took the average of these OHWM measures as the OHWM of the Pearl River at river mile 17.9. (*See,* Corps Exh. 6, p. 2).

The questionable validity of this procedure is apparent, not only because it results in an OHWM which is higher than any measured water level at the site (except Buttrey's April 27, 1982 flood-period measurement), and which extends *into* manicured lawns in the subdivision (*see,* Buttrey Exh. 10), but also because the Corps failed to determine the river's OHWM by surveying the river itself at mile 17.9. On March 8, 1982, the actual water level at river mile 16.7 was 7.69 feet NGVD (Corps Exh. 6). If, as claimed by the Corps (Findings, p. 17), the river elevation is .6 feet higher at mile 17.9 than at mile 16.7, the water elevation at river mile 17.9 would have been only 8.29 feet NGVD on March 8, 1982, or 1.71 feet lower than its calculated OHWM. Also noteworthy is the fact that the effect of the Corps's conclusion is to extend the banks of the West Pearl River over four miles of forested swamp. The result is arbitrary and unreasonable, in complete contradiction of the Corps's prior characterization of the area as a wetland "not subject to tidal action or ordinary high waters of other streams". (Buttrey Exh. 15c; *see also,* Corps Exh. 16, p. 2).

Accordingly, judgment will be entered in favor of plaintiffs John Buttrey and John Buttrey Developments, Inc., and against defendants United States of America, Clifford L. Alexander, Jr., Secretary of the Army, Operating through the U.S. Army Corps of Engineers, Lieutenant General Joseph K. Bratton, Chief of Engineers, and Colonel Robert H. Ryan, District Engineer, U.S. Army Corps of Engineers, Mobile District, enjoining them from exercising jurisdiction over the sites of the sewage treatment plant and the pond.