BBYRNES, Judge.
Plaintiffs-appellants, Casey and Angie Kieff[1], appeal a judgment denying their claim for damages arising out of an alleged[2] collision between a boat operated by Casey Kieff and a water control structure erected by Louisiana Land & Exploration Company (LL & E) on property owned by LL & E. LL & E and its employee, Kermit Coulon, Jr., were the named defendants. We affirm the trial court’s judgment in favor defendants on the basis of recreational use immunity. We reach this result based on the following four findings:
1. The location of the alleged accident was on privately owned, undeveloped, nonresidential rural property.
2. The water control structure allegedly struck by the plaintiff is part of the “true outdoors.”
3. The plaintiff was engaged in noncommercial outdoor boating activities during the day and at the time of the alleged accident.
*87 |j>4. The wetlands/marshlands area where the accident allegedly occurred was not navigable.
The first three findings were also explicit findings of the trial court. The fourth finding is necessarily implicit in the trial court’s application of recreational use immunity. Additionally, the question of navigability runs throughout the testimony and evidence in the record, and there can be no doubt that the trial judge adverted to the issue.
On March 3, 1997, Casey Kieff set out in a twenty-one foot boat belonging to his uncle, Percy Dardar, Sr.[3], in the Pointe au Chien area. Towards the end of the day, while operating in Bayou Jean LaCroix, in an effort to get back before dark, Casey elected to take a shortcut from the Bayou to the Grand or Cutoff Canal through an unnamed marshy area. In doing so Mr. Kieff allegedly ran into LL & E’s submerged water control structure resulting in damage to the boat and considerable injury to himself. The main thrust of plaintiffs’ case is that LL & E owed a duty to at least properly mark the structure in a manner that would be visible to otherwise unsuspecting boaters.
I. The location of the alleged accident was on privately owned, undeveloped, nonresidential rural property.
The trial court based its decision in favor of LL & E on the recreational use immunity provided by LSA-R.S. 9:2791 and 9:2795. In' her written reasons for judgment, the trial court found that the scene of the alleged accident was in an “undeveloped, nonresidential area” in the middle of an uninhabited marshlands/wetlands area, in accordance with the prerequisites of those statutes. 13Coincidentally, Verdin v. Louisiana Land and Exploration, 96-1815 (La.App. 4 Cir. 3/12/97), 693 So.2d 162, writ den. 97-1581 (La.9/26/97), 701 So.2d 994, also involved a similar boating accident in the Point au Chien area on LL & E wetlands/marshlands property similar to and not far from the site of the alleged accident in the instant case. In that case this Court ruled in favor of LL & E on the basis of recreational use immunity. Citing the Supreme Court case of Ratcliff v. Town of Mandeville, 502 So.2d 566 (La.1987), this Court enunciated certain prerequisites to the applicability of recreational use immunity:
First, the property where the injury occurred must be an undeveloped, nonresidential rural or semi-rural land area. Second, the injury itself must be the result of recreation that can be pursued in the “true outdoors.”
Verdin, p. 5, 693 So.2d at 166.
There are no roads accessing the area where Mr. Kieff allegedly encountered the LL & E water control strucutre. The plaintiff does not contend otherwise, preferring to focus his argument instead on his contention that the site of the accident was located in navigable waters and therefore not qualified for recreational use immunity.
Kermit Coulon, manager of LL & E’s Houma office, testified without contradiction that LL & E owned approximately 650,000 acres “which span over a seven-parish area in coastal Louisiana.” He testified that:
The Pointe Au Chien area is a brackish-type marsh bordering on immediate marsh. It’s primarily wetlands with large open ponds and bays and things. Typical wetland in that area.
Mr. Coulon added the property was undeveloped and that all kinds of recreational users were allowed access to the LL & E property, including fishermen, hunters, crabbers, and bird watchers.
14We cannot say that the finding by the trial court that the area of the accident was undeveloped and nonresidential/rural *88 in nature is manifestly erroneous or clearly wrong.
II. The water control structure allegedly struck by the plaintiff is part of the “true outdoors.”
In Verdin, p. 7, 693 So.2d at 166-167, this Court noted a third criterion in addition to the two criteria described in Ratcliff, supra: the injury causing instrumentality must be of the type normally encountered in the “true out-doors” and not of the type usually found in someone’s backyard. We agree with the trial judge’s finding that: “Clearly a water control device meets this standard.” In fact, the water control device designed to prevent wetlands erosion in the instant case, is, if anything, more typical of undeveloped land than was the concrete boundary marker that was the offending structure in Verdin.
III. The plaintiff was engaged in a non-commercial outdoor boating activities during the day and at the time of the alleged accident.
At trial Mr. Kieff testified that he was engaged in the paid commercial occupation of repairing commercial traps and nets for his uncle, Percy Dardar.
In Verdin, the plaintiffs held commercial fishing licenses and claimed to have been engaged in that commercial non-recreational activity at the time of the accident. The jury concluded otherwise. This Court found that there was adequate evidence to support the jury finding. Similarly, in the instant case the trial court in her written reasons for judgment found that:
Kieff testified that he was in the boat for a commercial purpose for his uncle. He claims to have been surveying the area where he would later begin work. His own actions belie this contention. He wasn’t being paid for any work on March 3, 1997. He had no equipment |Bto perform any work on his boat. He clearly had no commercial purpose on the day the accident occurred. [Emphasis added.]
At trial, Mr. Kieff admitted that he was not paid for any of his day-of-the-accident activities at the time. When deposed nine months after the accident in January of 1998 he testified that: “I never did get paid for it, because I never did do nothing.” However, at trial he went on to testify that he eventually did get paid long after the date of the accident, some time after his deposition. A reasonable fact finder could have accepted this testimony, based on the assumption that the family relationship between the plaintiff and his employer uncle explained the unprofessional nature of the payment. However, a reasonable fact finder could also have inferred, as the trial judge did, that either such payment never took place or, if made, was all too conveniently made only as an afterthought in contemplation of this litigation. The suspicious timing of the payment, if any, coupled with other inconsistencies in plaintiffs case, combined with the inherent prerogative of the trial court to make credibility calls, all support the trial court’s finding that Mr. Kieff was not engaged in commercial activity at the time the accident allegedly occurred.
Although the factors discussed in the previous paragraph appear to be sufficient under the manifest error standard to justify the trial court’s finding concerning the non-commercial nature of Mr. Kieff s activities at the time of the alleged accident, following the Supreme Court’s admonition in Ambrose v. New Orleans Police Dept. Ambulance Serv., 93-3099 (La.7/5/94), 639 So.2d 216, to review the entire record, we note, additionally, the testimony of Sergeant Richard Liner on this issue. Sergeant Liner of the Terrebonne Sheriffs water patrol office testified that when he encountered Casey Kieff the morning after the accident, Mr. Kieff did not look like someone who had |fibeen stranded in a boat all night long.[4] His clothes did not appear *89 to be wet. Mr. Kieff did not change clothes while he was with Sergeant Liner. When Sergeant Liner went out to investigate the scene of the accident, he saw nothing in the boat, no welding machines, no bottles, and no pipes, in short nothing to indicate that he was engaged in the type of trap and net repair activities testified to by the plaintiff.[5]
Sergeant Liner’s disinterested testimony, coupled with the unconvincing nature of Casey Kieff s testimony, would permit a reasonable fact finder to conclude, as did the trial judge, that Mr. Kieff was not engaged in any form of commercial enterprise on the date of the alleged accident. Therefore, it is impossible for this Court to say that the trial court was manifestly erroneous in concluding that Mr. Kieff was not being paid at the time of the accident, nor was he engaged in a commercial enterprise.
IV. The wetlands/marshlands area where the accident allegedly occurred was not navigable.
Sergeant Liner considered the location to be nothing more than marsh. He did not observe any holes in the boat when he went to investigate. However, in spite of the fact that his boat only drew Vk feet of water, he was not able to maneuver it close enough to Kieff s boat to totally eliminate the possibility of the existence of holes. Sergeant Liner testified that he had never seen a large boat, or any commercial boats in the area, and that it was not a normal area for boat travel. He suggested that what boats there might be in the area would probably be crab boats because they have very shallow draft.
^Sergeant Liner’s testimony also supports the trial judge’s implicit finding that the alleged accident did not take place on navigable waters as distinguished from the cases of D’Albora v. Garcia, 144 So.2d 911 (La.App. 4 Cir.1962), Discon v. Saray, Inc., 262 La. 997, 265 So.2d 765 (1972) and Buras v. United Gas Pipeline Co., 598 So.2d 397, 400 (La.App. 4 Cir.), unit den. 605 So.2d 1147 (La.1992).
In the instant case plaintiffs alleged accident occurred in what was undisputedly an area privately owned by the defendant, L.L. & E. In Buras the injury did not occur on a private tract of land, but on a navigable waterway connecting the Mississippi River to the Gulf of Mexico.
D’Albora, is distinguishable because the canal in question was referred to as “a thoroughfare to Lake Pontchartrain,” and for many property owners in the area was “the only access to the lake.” Id. at 912. There was also evidence of moving a houseboat through the canal, and testimony that the canal was navigable even at low tide. There was no mention of boat engines kicking up mud in D’Albora in contrast to the instant case. Moreover, in D’Albora the trial court made a finding of navigability. In the instant case the trial court made the opposite finding, which is a finding of fact not to be reversed by this court in the absence of manifest error.
In Discon, the canal in question had been used by commercial floating pile drivers and barges and had a commercial dock fronting on it for crew boats used in oil operations.
Thus, Sergeant Liner’s testimony when added to other similar evidence and then weighed against countervailing evidence found after reviewing the record as a whole on the question of navigability as discussed below, would permit a reasonable fact finder to conclude that the scene of the alleged accident was not Innavigable in such a sense as used in the distinguished cases immediately above and as would preclude LL & E’s entitlement to recreational use immunity.
*90 The plaintiff brought out that the accident area is subject to the ebb and flow of the tide which is a factor to be considered when deciding the question of navigability. However, the record also reflects that to consider “ebb and flow of the tide” as dispositive of the question of navigability would be unrealistic in the vast Louisiana coastal wetlands area which is all subject to the ebb and flow of the tide, but which cannot be viewed as a whole simplistically as a highway for interstate commerce, which is really the better test. As this Court stated in Sinclair Oil and Gas Co. v. Delacroix, 285 So.2d 845, 852-853 (La.App. 4 Cir.1973):
The case of Burns v. Crescent Gun and Rod Club, 116 La. 1038, 41 So. 249 (1906) is a clear demonstration of the difference between navigable waters belonging to the State and nonnavigable waters susceptible of private ownership. In that ease several bodies of water were considered as here, all of which were connected. That court held Irish Bayou to be navigable water (the Bayou was 200' in width, 15' in depth, was directly connected to Lake Pontchartrain, and was historically useful to vessels of large size) and then held that Irish Lagoon, Little Irish Bayou, Second Branch Bayou and Bayou Castiglione were nonnavigable and subject to private ownership. This determination of nonnavigability was reached despite factors of (1) being affected by ebb and flow of tide; (2) existence of a few feet of water; (3) communication with the lake; and (4) periodic entrance by fishermen to fish in skiffs. The court summed up: “Navigable means when a stream is large enough to float a boat of some size, engaged in carrying trade. It implies a possibility of transporting men and things.” [Emphasis added.]
The mere fact that water is deep enough to float a pirogue or a flat-bottomed fishing boat does not prove navigability. Johnson v. State Farm Fire and Casualty Co., 303 So.2d 779, 785 (La.App. 3 Cir.1974). This is consistent with LSA R.S. 9:2791A which includes boating among the activities to which recreational use immunity applies. It is also consistent with the LSA R.S. 9:2795 definition of “Land” as including water and watercourses and includes among those activities to which the recreational use |aimmunity applies fishing, trapping, boating, motorized vehicle operation and water skiing. We find that the type of boating which the trial judge implicitly found to be typical of the area where the accident allegedly occurred in the instant case was well within the intendment of the recreational use immunity statutes, LSA R.S. 9:2791 and 9:2795.
There is no presumption of navigability. Id. The trial court’s findings of fact on the question of navigability are reviewable by this Court under the manifest error standard of review. Id.
There was a great deal of evidence and testimony in the lower court on the question of navigability. The plaintiff does not argue that we should infer from the failure of the trial court judge to specifically refer to the question of navigability, that she failed to appreciate the significance of the issue. Implicit in the judgment of the trial court is a finding that the area where the accident occurred is not “navigable.” Although not mentioned in the recreational use immunity statutes, navigability has been deemed to be a factor by the jurisprudence. For example, in Buras, 598 So.2d at 400, this court found that:
In the present case, plaintiff was injured in an area near Venice, Louisiana known as Tante Phine Pass. It is undisputed that the canal where the injury occurred is a navigable waterway. Evidence presented at trial indicates that the canal is located in an area which allows navigation from the Mississippi River to the Gulf of Mexico.
*91 We find that the canal on which plaintiff was injured in this case is not contained in a private tract of land which the landowner opened for recreational purposes. Rather, |1flit is a navigable waterway which affords access from the Mississippi River to the Gulf of Mexico. [Emphasis added.]
This Court found that the area where the accident occurred in Verdin was not navigable. Jefferson Davis DeBlieux, IV, LL & E’s custodian of land records and a registered professional land surveyor, as well as an ardent outdoorsman and boater, who was well familiar with the area where the accident took place, when asked to compare the accident scene to the accident scene in Verdin, testified that, “The terrain, the marsh, is exact [sic] same.” He described the area as “an undeveloped marsh area; more like a duck pond area.” There are no roads accessing the area, and in order to do so Mr. DeBlieux testified that one could only do so in a “very small boat, or air boat.” He went to the site to inspect it after the accident in an air boat. He did not take any formal depth soundings, but his air boat, which drew only five or six inches of water, was dragging the bottom in the vicinity of the water control structure. He testified emphatically that the water control structure that was allegedly struck by Casey Kieff was not located in the bayou.
Sergeant Liner initially testified when asked by plaintiffs counsel where the water control structure was that it was in Bayou Jean LaCroix. But when questioned further by plaintiffs counsel he explained that Casey Kieff was on Bayou Jean LaCroix when he decided to take a shortcut across a marshy area to the main canal when he struck the water control structure. Later, on cross examination he specifically testified that the structure was not in Bayou Jean LaCroix, but in an adjacent marsh that to the best of his knowledge was unnamed. When all of his testimony is read together, it becomes apparent that what might initially appear __]jjto be some inconsistency in his testimony concerning whether the water control structure is in Bayou Jean LaCoix is attributable to the fact that he was speaking in generalities initially (the structure is in the vicinity .of the bayou), but as he was questioned more specifically about the location, he responded more precisely with the description of the marshy area between the bayou and the canal. This is consistent with Casey Kieffs testimony about taking a shortcut from the bayou to the canal.
Tillman L. Naquin, Jr., an oyster fisherman who had lived in the area all his life, testified that he had on occasion taken the same shortcut when it got late. He also testified that crab traps in the area indicated at least two feet of water and that because of erosion there is less land in the area now than was shown on a 1994 map. He then testified that the area is not one for tugboats or large commercial boats. Structures like the one in question are not unusual in the marshes. He acknowledged that when he testified in his deposition that the area was impassable to boats in the winter, that such testimony was true. The biggest boat he ever saw going through the area in the summer had a draft of three feet, but when it went through it was going so fast that it would have drafted less because of the effect of “planing,” and even then it was dragging mud. He testified that it was a popular recreational fishing area enjoyed by the public. But most significantly he testified that the cut-in into the shortcut area is only five or six feet wide which would necessarily limit the size of watercraft able to access the area.
Captain Smith went twice to inspect the accident site, once when he and Mr. De-Blieux followed Mr. Kieff, and another time when they went without Mr. Kieff. They were in an eighteen-foot shallow draft (six inches) airboat, but still had some difficulty in approaching the site because they were kicking up mud, an indication l^of how shallow the water must have *92 been. He testified that he had never seen any commercial vessels, including any commercial shrimping or crabbing or fishing vessels, traveling through the area of the accident site because it is too shallow and because power lines running along the cutoff canal were so low that no commercial vessel could fit under them. Captain Smith had never seen any crab traps in the area where the accident occurred, in spite of the fact that he had been in the area on numerous previous occasions.
Plaintiffs expert, Captain Gerald Disler, is the holder of a U.S. Coast Guard’s Chief License, of limited horsepower. He testified that when he inspected the scene of the alleged accident:
Sir, I witnessed vessels passing through there while we were out there working. I saw with my own eyes, vessels in the sixty-five foot range, shrimp boats, passing through there with no problem.
Later, during cross-examination he explained that these sixty-five foot vessels were in the Cutoff Canal adjoining the water body where the accident occurred, but not actually in the marshy area where the accident occurred.
He also testified that there are some days during the year when the wind blows all the water out of the area. When asked how local people got around the area, Captain Disler testified that:
“The mode of transportation, as you asked before, is displacement craft being air boats, air cushioned craft and seaplane. * * * * And, sometimes even canoes and pirogues can skim across the top of emergent vegetation. Just because there’s not blue water there, doesn’t mean that it’s not navigable.”
Thus, Captain Disler’s view of navigability would include areas traversible only by extremely shallow draft boats, or effectively zero draft boats, not generally what this Court believes is the type of navigability that would exclude an area from 113the effect of the recreational use immunity statutes. When asked if the area were considered to be a good fishing spot he responded:
Sir, I don’t know, I don’t fish that area. But, this particular spot, where Casey Kieff was hurt, all of the locals said that was a good fishing spot. And, while we were there, several boats transited in and out of there. You know, fishing poles and nets and traps and stuff.
These types of activities described by Captain Disler are consistent with recreational use. In fact, this Court specifically noted in Verdin that in spite of the commercial fishing licenses held by the plaintiffs in that case, because they were pole fishing at the time of the accident' they were not considered to be engaged in a commercial activity.
Captain Disler described the area where the accident occurred as a nameless backwater. His testimony that there was “six foot of water there” is not corroborated by any other testimony.
The plaintiff, quoting from U.S. v. DeFelice, 641 F.2d 1169 (5 Cir.1981), cert. denied 454 U.S. 940, 102 S.Ct. 474, 70 L.Ed.2d 247 (1981), noted among the Corps of Engineers criteria for determining navigability the “[p]ast, present, or potential presence of interstate or foreign commerce.” There is no evidence of such commerce or potential commerce in the record of the instant case. The fact that an oysterman or a crabber might, on occasion, pass through the area of the accident on a small boat does not make it a highway for interstate or foreign commerce.
In his testimony on November 4, 1998, Mr. Kieff was involved with the following exchange with his own attorney under direct examination describing the area where the accident allegedly occurred:
|UQ. Now just to make it clear, when you saw this channel, you’re in Bayou Jean LaCroix, and you looked over and saw the Grand Canal or the Cutoff Canal?
A. Uh, uh (yes).
*93 Q. And you saw the water connecting the two. You told us you saw crab traps in there?
A. Yes. [Emphasis added.]
From this exchange, the trial judge must have inferred that Mr. Kieff was not referring to Bayou Jean LaCroix, but to an area connecting Bayou Jean LaCroix to the canal referred to variously as the Grand Canal, the Cutoff Canal or the Pipeline Canal. Not only is such an inference reasonable (thus, not manifestly erroneous or clearly wrong), but no other reasonable inference comes to mind.
A short time later in his testimony Mr. Kieff has the following exchange with his attorney from which it must again be inferred that the location of the accident was not in Bayou Jean LaCroix, but in a marshy area between that Bayou and the Canal:
Q. Again, this body of water behind is what we’re talking about, the area that he was trying to get through, that open water.
A. That pilings has marked, “to Cutoff-Canal,” on that.
Q. That’s coming towards—
A. That’s in the bay going to Jean LaCroix. [Emphasis added.]
Q. So that’s the area that we’ve all been talking about, whether or not you could get your boat in, what you’re in right there.
A. That’s it.
11fiHowever, on redirect examination the next day, Mr. Kieff testified that, after reviewing certain aerial photographs of the area he was now of the opinion that the accident took place in Bayou Jean La-Croix. Moreover, in his pre-trial deposition Mr. Kieff testified that the structure that he struck was in neither Bayou Jean LaCroix nor in the Cutoff-Canal. It is within the reasonable fact finding province of the trial judge to give greater weight to that portion of Mr. Kieff s testimony from which it can be inferred that the accident did not occur until after Mr. Kieff had turned out of the bayou into the shortcut, than to that portion of his testimony in which he belatedly revises that opinion based on a viewing of certain exhibits that do not compel the conclusion he reached.
Thus, we find no manifest error in the finding of the trial judge that the alleged accident did not occur on navigable waters.
Accordingly, for the foregoing reasons the judgment of the trial court is affirmed.[6]

AFFIRMED.

. In those instances where this opinion may refer to the "plaintiff” in the singular, the reference is to Casey Kieff alone.

. We deliberately employ the term "alleged” in reference to the accident because Casey Kieff was alone at the time the accident allegedly occurred, there were no witnesses, and the defendants have noted serious inconsistencies in the testimony and evidence presented by the plaintiffs. These inconsistencies call into question whether plaintiffs bore their burden of proving that there ever was an accident. However, the trial court did not specifically reach this issue and in affirming the trial court this Court does not reach it either.

. Percy Dardar, Sr. was an additional named plaintiff in the original petition, but he dismissed his claim with prejudice prior to the trial of this matter.

. Plaintiff alleged that in addition to sustaining physical injuries which formed the crux of *89 his claim for damages, he was also forced to endure a night in the wrecked boat before being rescued the next morning.

. Sergeant Liner also testified that he saw no holes in the boat.

. As we have affirmed the judgment below, we need not reach the substantive and procedural merits of the defendants’ answer to the appeal